303 So.2d 920 (1974)
Anthony LEGGIO et al., Plaintiffs-Appellants,
v.
REALTY MART, INC., et al., Defendants-Appellees.
No. 9952.
Court of Appeal of Louisiana, First Circuit.
November 12, 1974.
Rehearing Denied December 16, 1974.
Writ Refused February 7, 1975.
*921 Arthur Cobb, Baton Rouge, for plaintiffs-appellants.
Arthur G. Seale, John W. Swanner and Donald T. W. Phelps, Baton Rouge, for defendant-appellant Bob Davis d/b/a Davis Real Estate.
James D. Thomas, II, Baton Rouge, for defendant-appellant Realty Mart, Inc., Seaborn R. Wicker and James E. Crowe.
Wendell G. Lindsay, Jr., Baton Rouge, for defendant-appellant International Business Machines Corp.
Before SARTAIN, ELLIS and de la HOUSSAYE, JJ.
SARTAIN, Judge.
This is a suit for damages relative to a real estate transaction. Plaintiffs are Drs. Anthony Leggio and Leo Farmer (appellants). Defendants are Realty Mart, Inc., a real estate firm; Seaborn R. Wicker, Jr., its President; James E. Crowe, its Vice-President; Robert A. Davis, d/b/a Davis Real Estate; and International Business Machines (IBM). After a trial on the merits, before a jury, judgment was rendered dismissing plaintiffs' demands against each defendant, and plaintiffs have appealed. We affirm.
Appellants were interested in purchasing a piece of ground on which to build a medical clinic or office building. They contacted Realty Mart, Inc. and were shown some properties by Mr. Crowe including a six acre tract owned by IBM. When plaintiffs expressed an interest in the property, Mr. Crowe inquired of Mr. Davis as to its availability.
The record affirmatively shows that Mr. Davis, although he had no listing on the property, was reputed to represent IBM in the Baton Rouge area. He had handled several site acquisitions for IBM and was its exclusive listing agent for IBM's Baton Rouge office building, in which he had an office, and which adjoined the six acre tract.
On August 7, 1972, Mr. Davis wrote to Mr. Wicker of Realty Mart and advised him as follows:
"Dear Steve:
If you have firm development plans that we can review with IBM, I believe that a cash purchase price of $26,596.00 per acre would possibly be accepted at this time.
As previously discussed with you, it would be necessary to have at least a $2,000.00 deposit and submit an offer in the form of a purchase agreement granting IBM 30 days in which to process it before committee of approval. This figure would net IBM $25,000.00 per acre after paying 6% Realtors commission payable ½ to your office and ½ to the writer. As near as I can determine from IBM, the key to the sale is whether or not you have firm development plans that they can review as they wish to protect the environment of their branch office.

I would be happy to process such an offer at this time if your people are ready to go." (Emphasis ours)
Mr. Crowe showed the letter to Dr. Leggio and introduced him to an architect, Andrew Gasaway, Jr., who was to work out the "firm development plans" with the appellants. At that time (mid-August), appellants had no particular plans in mind. At least two later appointments with Mr. Gasaway were made by Mr. Crowe for appellants, *922 but neither was kept by either Dr. Leggio or Dr. Farmer. Consequently, no plans were ever drawn.
Finally, on September 21, 1971, Realty Mart had an option agreement prepared under which IBM would grant to appellants an option to purchase the property for $26,596.00 per acre, with appellants having a four months period within which to exercise the option. The instrument was reviewed by a personal acquaintance of Dr. Leggio who was an attorney. Several minor changes were made at this attorney's suggestion. Both appellants acknowledged that they knew the difference between an option and an agreement to purchase. The option was prepared in order to give more time to appellants for the preparation of plans.
Mr. Crowe was of the opinion that these plans would have to be fairly detailed. It is undisputed that IBM was not willing to sell the property to anyone unless it was sure that the use to which it was to be put was environmentally compatible with its own adjacent office building.
The option, which provided a six percent commission to be divided between Realty Mart and Mr. Davis, in the event of a sale, was forwarded to IBM by Mr. Davis on September 22, 1972, together with a letter discussing the same. He made no specific recommendations to IBM.
Prior to being approached by Realty Mart, Mr. Davis had presented an offer to purchase the property by Bradley Corporation for $25,000.00 per acre, which offer was not accompanied by any development plans. This offer was rejected by IBM because they thought the price was a little low and because no development plans accompanied the offer. Bradley then authorized Mr. Davis to offer $26,596.00 per acre and to have development plans prepared. On July 28, 1972, prior to being contacted by Realty Mart, Mr. Davis contacted James D. Dodds, an architect, and authorized him to prepare the plans. He gave Mr. Dodds no specific time within which to complete the plans which were ultimately accepted on September 22, 1972. Bradley's offer, together with the plans, were forwarded to IBM by Mr. Davis on September 25, 1972. In the covering letter, Mr. Davis advised IBM that he had agreed to acquire an undivided one-fourth interest in the property and would assist in its development.
On October 17, 1972, IBM wrote Mr. Davis and advised him that it was accepting the Bradley offer and rejecting that of appellants.
Throughout this period of time, Mr. Davis did not advise Realty Mart or appellants that any other offers were pending or that he had any personal interest therein. It is clear that Mr. Davis was participating personally in the Bradley offer because Bradley insisted that he do so. Bradley, being a foreign corporation, had the policy of requiring that a resident realtor participate with it in the acquisition of property so that their local co-owner would look after Bradley's interest.
Appellants claim that Realty Mart, Inc., Messrs. Wicker and Crowe, are liable to them in damages because they unreasonably delayed the transaction and therefore violated their fiduciary duty to appellants. There is ample evidence in the record to support the conclusion that the delay was due to appellants' failure to consult with Mr. Gasaway and thereby prevented the preparation of the required firm development plans. Although there may have been certain misunderstandings between appellants and Messrs. Wicker and Crowe, we do not find that there were any misrepresentations made to appellants by these officers of Realty Mart, Inc. They transmitted the only offer which they received, the option, on the day it was executed. We, like the jury, find no violation of a duty owed by Messrs. Crowe and Wicker to appellants.
Appellants claim that Mr. Davis undertook to represent them in this transaction and that he therefore owed them a *923 duty to reveal the existence of the Bradley offer and his participation therein. Mr. Davis denies that he represented appellants in any way and takes the position that he represented IBM alone and that he fully discharged his duty to them. It is undisputed that appellants' option was forwarded to IBM either the day of or the day following its receipt by Mr. Davis. The jury found that Mr. Davis owed no fiduciary duty to appellants and there is ample evidence in the record to support this conclusion. We do not believe that Mr. Davis assumed any duty towards appellants simply because he undertook to transmit to his client an offer for an option which provided that he was to share in the commission should the sale be consummated.
The expert testimony relative to the conduct and actions of Mr. Davis stands uncontradicted in the record to the effect that it would have been improper for him to have divulged to appellants the fact that Bradley was interested in the property because it would have set up a bidding situation between two prospective purchasers whereby Mr. Davis would have been afforded the opportunity to give one of the prospective purchasers an advantage over the other. This testimony is further to the effect that the duty Mr. Davis owed to appellants was to promptly transmit any offer appellants might make on the property. In addition, the uncontradicted expert testimony concerning the participation by Mr. Davis with Bradley Corporation in the acquisition of the six acre tract is that it was not improper or unethical so long as Mr. Davis advised the owner (IBM) of the extent of his participation.
Appellants urge that the result reached by the jury in finding for the defendants in this cause is manifestly erroneous in view of C.C. Arts. 3002 and 3003 and L.R. S. 37:1447. These articles deal with the duties imposed upon an attorney in fact and his liability for fault or negligence.
We prefer to hold that real estate brokers are licensed and regulated by the State of Louisiana under L.R.S. 37:1431 et seq. The second paragraph of Section 1447 provides:
"A. Anyone who is injured or damaged by the broker or his salesmen by any wrongful act done in the furtherance of such business or by any fraud or misrepresentation by the salesmen or broker may sue for the recovery of the damage before any court of competent jurisdiction."
Among the acts for which a real estate broker's license may be suspended under the provisions of Sec. 1454 are: making substantial misrepresentations; acting for more than one party in a transaction without the knowledge and consent of all parties thereto; selling or purchasing property for a commission in which he is interested as owner, unless he first discloses in writing to the purchaser or vendor his interest therein; and, indulging in conduct which is contrary to the established practice of real estate brokers and which is fraudulent or dishonest or designed to mislead a client. A real estate broker has a further duty to communicate to his principal all offers received and may be liable in damages for his failure to do so. Amato v. Latter & Blum, Inc., 227 La. 537, 79 So.2d 873 (1955).
We further note that a real estate broker, absent a special agreement, has no authority to bind his principal, or to negotiate on his behalf. The real estate broker renders a service by advertising and showing properties which are for sale, and by giving advice or recommendations to his client. We do not believe that the relationship thereby created brings the real estate broker within the purview of the mandate articles of the Civil Code[1] and that his duties are limited to those which can be analogically drawn from L.R.S. 37:1454 *924 and from the customs and practices of real estate brokers in general.
With respect to the argument advanced by appellants that Mr. Davis became their broker or intermediary under C.C. Art. 3016 when he agreed to transmit appellants' offer to IBM, again we prefer to adhere to the statutes rather than C.C. Arts. 3016 and 3017 because the articles themselves imply employment to negotiate with authority to bind another. In the case at bar Messrs. Wicker and Crowe did not have the authority to bind appellants nor were appellants legally obligated to purchase the property and could have terminated their interest therein at will. Having agreed with the findings of the jury that Mr. Davis acted properly, it is not necessary for us to consider IBM's alleged vicarious liability to appellants.
Accordingly, for the above and foregoing reasons, the judgment appealed is affirmed at appellants' costs.
Affirmed.
NOTES
[1] See Yiannopoulas, "Brokerage, Mandate, and Agency in Louisiana; Civilian Tradition and Modern Practice", 19 L.L.R. 777, for a detailed discussion of Louisiana's basic adoption of brokerage as a sui generis contract which may or may not coincide with agency and mandate articles, thus leading to the acceptance of the common law concept of agency in Louisiana.