388 So.2d 368 (1980)
LATTER & BLUM, INC.
v.
Robert R. RICHMOND.
No. 66856.
Supreme Court of Louisiana.
September 3, 1980.
Dissenting Opinion September 24, 1980.
*369 Herman & Herman, Avram C. Herman, Maury A. Herman, New Orleans, for plaintiff-applicant.
Law Offices of William J. Wegmann, William J. Wegmann, New Orleans, for defendants-respondents.
CALOGERO, Justice.
The question in this case is whether plaintiff Latter & Blum is entitled to a commission of $878.52 on a lease between defendant Robert R. Richmond and Richmond's tenant, J. A. Majors Medical Book Company. The trial court awarded the commission and the Court of Appeal reversed, 378 So.2d 546. We granted writs upon application of Latter & Blum to determine whether the Court of Appeal erred in denying them commission on the lease.
Robert Richmond bought a warehouse at 2120 South Roman Street in New Orleans subject to a lease by New Orleans Electrical Supply, Inc. which was scheduled to expire on August 31, 1976. The lease contained a standard clause which prohibited the sublease of the property without the written consent of the owner.
On February 17, 1976, New Orleans Electrical Supply gave a ninety day listing agreement to plaintiff to sublease the warehouse for the remaining six months of its lease. Jack Fisher, a Latter & Blum agent and the listing agent for New Orleans Electrical Supply, then contacted Richmond and asked him if he would pay a commission on any lease Latter & Blum might be able to secure past August 31, 1976. Richmond agreed that he would and signed a letter agreement to that effect on February 25, 1976. The letter contained a clause which stated that any tenant Latter & Blum might secure would be subject to Richmond's approval.
On Thursday, July 22, 1976, a fire occurred at the offices of J. A. Majors Medical Book Company (hereafter referred to as Majors) on Bienville Street in New Orleans. Majors needed a new warehouse location immediately because their books were exposed to the rain as a result of the fire. They contacted Henry Ogden, a Latter & Blum agent, to find them a suitable location. Ogden had not been able to discover them a suitable location by Saturday and was reduced to driving around looking for owners' signs. Later that day Robert Corder, Vice-President and Director of Commercial *370 Sales and Leasing at Latter & Blum, suggested to Ogden that he look at Richmond's South Roman Street warehouse. Ogden contacted Fisher, Latter & Blum's listing agent on the property, to see if the sublessor and/or lessor would agree to the sublease. Fisher did not testify at trial, but a fair reading of the record indicated that Fisher simply informed Ogden that Latter & Blum was authorized to act on behalf of New Orleans Electrical Supply under the exclusive listing agreement. Neither Fisher nor Ogden contacted Richmond at that time. Nonetheless, Ogden moved Majors' books into the warehouse that same day as it was already raining intermittently and Majors' merchandise would have suffered substantial damage if it had started raining any harder. Majors signed a sublease with New Orleans Electrical Supply the succeeding Monday.
No one at Latter & Blum made any attempt to contact Richmond either before moving Majors into Richmond's warehouse or at any time that weekend. On Monday, July 26, 1976, Corder called Richmond, told him of the urgency of the earlier situation, advised him that they had moved Majors in, and asked Richmond if that was agreeable to him. Richmond became very upset, told Corder that Majors was trespassing, that his consent under the lease was required before a subtenant of New Orleans Electrical Supply could be permitted to move in, and demanded that Latter & Blum get Majors out immediately or procure a one year lease "immediately."[1] He agreed to give Latter & Blum a commission if they procured a lease immediately and in a slightly later conversation he warned Corder, "Bob, if I don't have that signed lease by Thursday, Majors belongs to me."
Majors objected to signing a one year lease with Richmond because their Bienville Street lease with Victory Land Company obligated them to continue as tenants in the Bienville Street property if Victory Land could rebuild within 120 days of the fire. Majors did not want to end up leasing two warehouses at the same time. They explained to Latter & Blum that they could not sign a one year lease with Richmond unless Victory Land agreed to waive their 120 day rebuilding clause or Richmond agreed to give Majors the right to cancel the one year lease if Victory Land was able to rebuild within 120 days. Ogden contacted a member of the Schlesinger family, the owners of Victory Land about waiving the 120 day clause, but Victory Land refused to waive it.
There was some discussion between Ogden and Richmond concerning a 120 day cancellation clause in a prospective Richmond-Majors lease, but at no time did anyone at Latter & Blum present to Richmond a proposed property lease with or without a 120 day cancellation clause. By Wednesday (just four days after Majors moved into the property) relations between Latter & Blum and Richmond were rapidly worsening.
On Wednesday Richmond learned in a telephone conversation with Ogden that the Schlesinger family, whom he knew to be major stockholders in Latter & Blum, owned Victory Land Company. This discovery confirmed in Richmond's mind suspicion that Latter & Blum was not representing his interest in the negotiations. In the same phone conversation with Ogden, Richmond suddenly became angry at Ogden and warned him, "If you don't have that lease signed immediately, ...."[2] Ogden *371 ended that conversation by hanging up on Richmond. Richmond's confidence in Latter & Blum was also shaken when he received reports that Latter & Blum was continuing to look for another warehouse for Majors[3] at a time when Majors was occupying Richmond's warehouse without his consent and without having signed any type of lease.
As there seemed to be no progress in the negotiations, Richmond contacted his attorney around Wednesday to see if he could evict Majors immediately. The attorney advised him against precipitous action partially because the eviction process was complicated by the fact that Majors had signed a sublease with New Orleans Electrical Supply, a company which had a valid lease of the building until August 31, 1976. Richmond's attorney wrote a letter on July 30, 1976, to Latter & Blum and Majors informing them that Majors' possession was illegal and unauthorized, that they would both be held liable for damages. He demanded that Majors vacate the premises immediately. On August 3, 1976, Richmond's attorney wrote a letter to New Orleans Electrical Supply advising them of their violation of the sub-lease provision of the contract (i. e. no sub-lease without prior written consent of the owner) and notifying them that they had ten days in which to "correct the default." Copies of this letter were sent to Latter & Blum and Majors.
Richmond thereupon authorized Francis Henry,[4] a real estate agent whom he had known for three to four years, to negotiate a lease with Majors.[5] Henry made several phone calls and thereafter informed Richmond that indeed Majors would not sign a one year lease without a 120 day cancellation clause, but assured him that he had no real risk of losing Majors after 120 days because Victory Land could not possibly rebuild their Bienville Street Warehouse within that time. Henry took Richmond by the burned out warehouse and thereafter Richmond signed a one year lease with Majors on August 11, 1976, at $1.00 per square foot with a 120 day cancellation clause. Henry did not ask for a commission, explaining that only a few phone calls had been involved. And when Richmond insisted upon paying Henry a commission Henry suggested as a matter of professional courtesy that Latter & Blum receive part. Richmond thought little of that suggestion and thereupon paid Henry a full 6% commission on the one year lease, or $878.52.
Plaintiff Latter & Blum filed suit for a commission on the lease. They claimed that they were the procuring cause of the lease and that they would have been able to close the deal if Richmond had given them permission to insert the 120 day cancellation clause into the contract. Richmond filed a reconventional demand asking for damages for trespass.
The trial court dismissed defendant's claim for damages and found that Latter & Blum was the procuring cause of the lease and was entitled to a commission.
The Court of Appeal upheld the trial court's dismissal of defendant's trespass action, but reversed on the commission issue. They held that Latter & Blum breached their fiduciary duty to Richmond under La.Civ.Code art. 3017 which requires a broker to "observe the same fidelity to all parties, and not favor one more than another." The Court of Appeal reasoned that once this duty had been breached and the contract repudiated, plaintiff's only right to a commission *372 was based on the "second chance" given to Latter & Blum to negotiate a lease "immediately." Finding that Latter & Blum did not consummate the execution of a lease, the Court of Appeal held that Latter & Blum was not entitled to a commission.
We affirm the Court of Appeal's decision denying plaintiff a commission, but prefer to base our holding on slightly different grounds.
Courts and commentators in Louisiana have wrestled for years with the problem of attempting to define the duties of brokers, particularly real estate brokers. See Yiannopoulos, Brokerage, Mandate, and Agency in Louisiana: Civilian Tradition and Modern Practice, 19 La.L.Rev. 777 (1959), Comment, The Real Estate Broker-Purchaser Relationship: Louisiana and Common Law, 52 Tul.L.Rev. 157 (1977). The Louisiana Civil Code Articles relied upon by the Court of Appeal define a "broker" as a person "employed to negotiate a matter between two parties, and who for that reason, is considered as the mandatary of both." La.Civ.Code art. 3016. The obligations of a broker differ from those of an ordinary mandatary in that "his engagement is double, and requires that he should observe the same fidelity towards all parties, and not favor one more than another." La.Civ.C. art. 3017. However, the courts in Louisiana have supplemented the Code's mandate articles by reference to common law rules relating to brokerage contracts. 19 La.L.Rev. 794-795. Other duties are imposed upon real estate brokers as the result of the passage of special real estate statutes. See R.S. 37:1431 et seq.
The jurisprudence on the nature and source of the real estate broker's duties seems confusing even in the relatively straightforward situation where the broker is employed to find a buyer for the property. Some cases impose "common mandatary" status on the broker at the time he has found a prospective purchaser, Treadaway v. Piazza, 156 So.2d 328 (La.App. 4th Cir. 1963); Uhlich v. Medallion Realty, Inc., 334 So.2d 788 (La.App. 4th Cir. 1976); another has held that a broker becomes a dual fiduciary only after a transaction is consummated, Maloney v. Aschaffenburg, 143 La. 509, 78 So. 761 (1918), while at least one case has held that the Code articles on mandate do not apply to real estate brokers at all and brokers' duties are limited to those imposed by the real estate licensing statute. Leggio v. Realty Mart, Inc., 303 So.2d 920 (La.App. 4th Cir. 1974).
In Amato v. Latter & Blum, Inc., 227 La. 537, 79 So.2d 873 (La.1956) this Court found that a real estate broker breached his duty to the public at large imposed by the real estate licensing statute when he failed to transmit an offer to his principal, the prospective vendor. Another Louisiana court has found a breach of duty on the part of a broker employed to find a certain type of property who arranged for a friend to buy the property first and then resold it to the purchaser for an inflated price. Uhlich v. Medallion Realty, Inc., supra. Another such breach of duty was found when a broker failed to disclose a known material defect to the purchaser. Norgren v. Harwell, 172 So.2d 723 (La.App. 4th Cir. 1965). Ultimately the precise duties of a real estate broker must be determined by an examination of the nature of the task the real estate agent undertakes to perform and the agreements he makes with the involved parties.
The Fourth Circuit in a case with a somewhat similar fact situation held that an owner with an exclusive listing agreement with a real estate broker was justified in dealing directly with a prospective tenant and refusing to pay the broker a commission after he discovered that the broker had steered a customer away from his building. Latter & Blum v. Ocean Drilling & Exploration Co., 272 So.2d 53 (La.App. 4th Cir. 1973); See also Samuels, Inc. v. Michaels, 315 So.2d 613 (La.App. 4th Cir. 1975). The court in that case concluded that once the owner learned of the broker's breach of his duty to make reasonable effort to locate a suitable tenant, the owner could terminate the listing agreement and negotiate an agreement directly with the tenant without paying a commission to the broker.
*373 Whatever the precise scope of the duties Latter & Blum owed Richmond in this situation, these duties certainly included the duty not to induce a trespass to the detriment of the owner's interest. Latter & Blum went beyond their letter agreement or any right they legally had in moving Majors into the Roman Street property without Richmond's permission. By moving Majors in without permission Latter & Blum deprived Richmond of his strongest bargaining point  Majors' urgent need to confect a lease immediately. Once this breach of duty was committed Richmond was justified in terminating the February letter agreement which gave Latter & Blum the right to a commission. If this were not the case a real estate agent could profit by illegally placing a tenant in a building if he fences the owner into a situation where his only feasible economic alternative is to grant a lease to the intruder.
Plaintiff concedes that they had no authority to move Majors in, but they contend that Richmond later ratified that improper action. The record does not support that contention. Richmond's immediate response to Corder upon being informed of Majors' occupancy of the building was that Latter & Blum's actions were illegal and unacceptable to him. Richmond never deviated from his position that Latter & Blum had to get majors out of his building or bring him a signed one year lease agreement immediately. According to the testimony of Latter & Blum's own employee, Richmond gave them a deadline of Thursday to get Majors' signature on a lease.
We conclude that as a matter of law Richmond's obligations under the February letter agreement were terminated when Latter & Blum moved Majors in without Richmond's permission; and Richmond's conversation with Corder on Monday reflected that reality. After Monday the only agreement in existence which entitled Latter & Blum to a commission was Richmond's offer that Latter & Blum would receive a commission if they presented him a signed lease agreement by Thursday. Plaintiff failed to present him a lease by Thursday and there was no agreement on a commission after this deadline. Thus, plaintiff failed to prove the existence of an agreement entitling them to a commission. Shannon Real Estate, Inc. v. Toll, 223 So.2d 693 (La.App. 4th Cir. 1969).
If within the extension granted (to Thursday) Richmond had been presented with a signed lease agreement or had been offered a lease with a 120 day cancellation clause, our decision might be different. However, the record does not show that Richmond was ever presented a lease signed by Majors or even a draft of a proposed lease agreement. At most there was some marginal discussion concerning Majors' objection to signing a one year lease unless they could be released from Victory Land's contract or obtain a 120 day cancellation clause. The ease with which Francis Henry completed the negotiations within forty-eight hours after getting involved suggests that Latter & Blum could not have been making very serious efforts to conclude a lease agreement.
Latter & Blum argues that at worse they were afforded until August 13th to secure the lease, by Richmond's attorney's letter affording ten days to "correct the default" and that Richmond's signing the lease with Majors on August 11th made their performance impossible. The fallacy in this argument is that Richmond never gave Latter & Blum any such ten day notice. The only deadline he gave them was Thursday, July 27th. The letter upon which Latter & Blum relies was one which Richmond's attorney found necessary to serve upon New Orleans Electrical Supply, Richmond's lessee who was specifically afforded by the written lease ten days to correct defaults. Latter & Blum simply received an acknowledged copy of that letter, which as between Richmond and New Orleans Electrical Supply was a necessary forerunner to institution of eviction proceedings against New Orleans Electrical Supply.
We need not consider Richmond's reconventional demand for damages based on trespass as he failed to properly preserve *374 this issue when he did not seek writs to this Court. Jordan v. Travelers Ins. Co., 245 So.2d 151 (La.1971).

Decree
For the foregoing reasons the judgment of the Court of Appeal is affirmed.
AFFIRMED.
MARCUS, J., dissents and assigns reasons.
DENNIS, J., dissents with reasons.
MARCUS, Justice (dissenting).
I agree with the trial judge that Latter & Blum, Inc. was the procuring cause of the lease and was entitled to a commission. Any breach of duty by Latter & Blum, Inc. by moving Majors into the property without Richmond's permission was waived when Richmond subsequently agreed to give Latter & Blum, Inc. a commission if they would procure a lease with Majors. When negotiations broke down because Richmond refused to allow a 120-day cancellation clause in the lease, Richmond negotiated a lease with Majors on the same terms and conditions, including a 120-day cancellation clause. Accordingly, I respectfully dissent.
DENNIS, Justice, dissenting.
I respectfully dissent.
The trial judge apparently found that Latter & Blum did not breach its fiduciary duty to Richmond because the tenant it procured and allowed to move in was actually acceptable to the landlord, who ultimately negotiated a lease substantially on his original terms with the tenant. I am not convinced that the evidence fails to support the trial judge's findings and conclusions. However, even under the majority's determination that the broker breached its fiduciary duty, it appears the broker is nevertheless entitled to a fee. The landlord clearly either forgave the breach or extended the contract for a limited time and authorized the broker to continue negotiations. The efforts of the broker, acting under its original contract or an extension thereof, were the procuring cause of the lease ultimately consummated by the landlord with the tenant produced by the broker.
NOTES
[1] Richmond was asking then, as later, for $1.00 per square foot which was a very small increase from the $.93 per square foot charged New Orleans Electrical Supply in a lease that had been negotiated in 1973.
[2] Richmond was a man who owned and managed many properties. The warehouse on Roman Street was only one of perhaps fifty pieces of property Richmond owned. While he treated Latter & Blum in this instance as he would any other real estate broker ("bring me a tenant and I'll pay you a commission") he testified that he had never done much business with Latter & Blum because he thought that they had too many conflicts of interest. It was this pre-existing feeling he had about Latter & Blum that prompted him to be so hugely upset when they moved Majors into his warehouse without his authorization. Also contributing to his anger was that to a very limited extent he was a business peer of Latter & Blum and his inability to get out of the situation they put him in was an insult to his professional pride. He testified that other real estate people had told him he was foolish in allowing Majors to continue occupancy without a lease.
[3] At trial Ogden admitted that he had continued to look for another warehouse for Majors up until the date Majors signed a lease with Richmond.
[4] Francis Henry died before trial and thus did not testify.
[5] Francis Henry had called Richmond about another matter when the subject of Richmond's trouble with the Roman Street property came up. Richmond told Henry that he was too upset to talk about it, but Henry told Richmond that he would come talk to him about the problem. After they met and discussed the situation Henry offered to help.