844 So.2d 860 (2003)
Don M. COUSINS, Eagle Ventures, Inc., et al.
v.
REALTY VENTURES, INC. and Leo M. Hodgins, et al.
No. 01-CA-1223.
Court of Appeal of Louisiana, Fifth Circuit.
January 14, 2003.
Order on Rehearing in Part May 7, 2003.
*863 Patricia S. LeBlanc, Kelly M. Rabalais, Metairie, LA, for Appellee.
David C. Loeb, Daniel E. Zelenka, II, New Orleans, LA, for Appellants.
Panel composed of Judges EDWARD A. DUFRESNE, JR., SOL GOTHARD, JAMES L. CANNELLA, MARION F. EDWARDS and CLARENCE E. McMANUS.
MARION F. EDWARDS, Judge.
Following trial, the jury in this case found that defendants, Leo Hodgins, Realty Ventures, Inc., and 4141 Vets Limited Partnership, breached their duty to plaintiffs, Eagle Ventures, Inc. and Veterans Villa Properties, Inc., and awarded plaintiffs $1,750,000.00. At issue on appeal is whether the jury verdict and award are erroneous. For the following reasons, we affirm in part, reverse and part, and render judgment based upon a de novo review of the record.
FACTS AND PROCEDURAL HISTORY
The named plaintiffs in this case are Don Cousins, Eagle Ventures, Inc., and Veterans Villa Properties, Inc. This case arises from certain events surrounding plaintiffs' (Don Cousins, Eagle Ventures, Inc. and Veterans Villa Properties, collectively referred to as "plaintiffs") interest in purchasing commercial property located at 3330 Lake Villa Drive in Metairie. Don Cousins acted as the representative/agent for Eagle Ventures, which later assigned its rights to Veterans Villa Properties. Mr. Cousins' first task for Eagle Ventures was to find a real estate investment for the corporation to purchase. To do so, Mr.
*864 Cousins engaged the services of Leo Hodgins, a real estate agent/broker and owner of Realty Ventures, Inc., ("RVI").
Mr. Cousins was aware of Leo Hodgins' reputation as a real estate broker familiar with the Jefferson Parish market, based on the fact that Mr. Cousins rented space for his insurance business on 2700 Kingman Street in Metairie from Leo Hodgins, who owned that building. In fact, their offices were located next to one another, and it was not uncommon for the two men to interact on a daily basis. Additionally, Mr. Cousins chose to work with RVI and Leo Hodgins because Mr. Hodgins held himself out as an experienced real estate broker and property manager. In early 1991, Mr. Cousins asked Leo Hodgins to find some commercial real estate for Eagle Ventures to purchase. The two men did not execute a written agreement.
In March of 1991, Leo Hodgins learned that 3330 Lake Villa Drive, an 8,000 square foot office building, owned by Westinghouse Credit Corporation, was being sold for $125,000.00 after he received a letter from Russell Day, the Westinghouse Credit Corporation employee who oversaw the property from July, 1990, through January, 1992. In response, Leo Hodgins drafted a listing agreement and sent it Mr. Day. However, Westinghouse rejected the agreement because at the time it decided not to use an agent to market its properties. In June 1991, Leo Hodgins first brought 3330 Lake Villa to Mr. Cousins' attention. Thereafter, Leo Hodgins arranged to show 3330 Lake Villa to Mr. Cousins. While showing 3330 Lake Villa to Mr. Cousins, Mr. Thomas and Mr. Gaffney, Leo Hodgins directed their attention to its neighboring property 4141 Veterans Boulevard, a 33,000 square foot office building, noting it was also owned by Westinghouse and was for sale. Mr. Cousins apparently told Leo Hodgins that they were not interested in a property of that size. However, he was very interested in 3330 Lake Villa and asked him to submit an offer to Westinghouse on Eagle Ventures, Inc. for $90,000.00 for 3330 Lake Villa Drive. Leo Hodgins disputes that he prepared the purchase offer that contained a two-day expiration period and improperly referred to Eagle Ventures as "Eagle Enterprises, Inc." Despite this mistake, Mr. Cousins signed the offer as the purchaser with Leo Hodgins as the selling agent, and Mr. Hodgins submitted the offer to Westinghouse Credit Corporation on June 5,1991.
Several days later, Mr. Cousins asked Leo Hodgins if Westinghouse had yet responded to the offer. Leo Hodgins replied that Westinghouse was re-evaluating all of its real estate holdings and was unable to sell the property at the time because it was having difficulties with Tonti Management, which was managing some of its local commercial holdings including 3330 Lake Villa. He assured Mr. Cousins there was no need to worry about or modify the existing offer. Mr. Cousins continued to check with Leo Hodgins on regular basis concerning the availability of 3330 Lake Villa Drive. Mr. Cousins told Leo Hodgins that Eagle Ventures would increase its offer to $120,000.00 and asked Leo Hodgins if he thought that might help move things along. Leo Hodgins advised Mr. Cousins it was not necessary to do so. In August and September of 1991, Leo Hodgins told Mr. Cousins that he would check into the status of Eagle Ventures' offer.
In October 1991, Leo Hodgins resubmitted Eagle Ventures' June 1991 offer on 3330 Lake Villa Drive to Westinghouse.[1] *865 Not long after this submission, Mr. Day informed Leo Hodgins that Westinghouse was unable to sell the property as long as it could not terminate its contract with Tonti Management. At some point between late 1991 and early 1992, Russell Day was laid off from Westinghouse. However, he told Leo Hodgins that Westinghouse was ready to sell 3330 Lake Villa, but only as part of a package deal with its neighboring property, 4141 Veterans Boulevard, because those two buildings shared parking space. Sometime prior to January 1992, Leo Hodgins asked his brother Paul Hodgins (who worked with Leo Hodgins at RVI) if he was interested in a one-third partnership in a company that would purchase 3330 Lake Villa and 4141 Veterans Boulevard. Leo Hodgins told his brother, Paul Hodgins, that Russell Day would be the third partner but that Russell Day was not going to put up any money. Despite this perceived inequity, Paul Hodgins agreed to the deal based on Leo's assertion to him that the properties were worth approximately $1,000,000.00 and could be purchased for $420,000.00. Leo Hodgins chose not to tell Mr. Cousins about the package deal. Leo Hodgins claimed at trial that, in his opinion, Eagle Ventures would not be interested in both properties. He based his opinion on Don Cousins' comment that 4141 Veterans was too big and his belief plaintiffs were not in the requisite financial position to close such a deal.
Russell Day contacted Michael Zibilich, the Westinghouse representative then handling the properties, to let him know that Leo Hodgins wanted to purchase both properties. Paul Hodgins contended that he and his brother went to a law firm office in March 1992, to prepare the purchase agreement. At that time, he thought Russell Day was still a partner in the deal. He testified he later found out that Russell Day decided not to participate because he was afraid of a potential lawsuit.
In March 1992, Mr. Cousins drove by 3330 Lake Villa and noticed the property was listed for sale with Sterling Properties, Inc. Don Cousins contacted Sterling and learned for the first time that Westinghouse wished to sell 3330 Lake Villa and 4141 Veterans Boulevard as a package for $425,000.00. Don Cousins contacted the other members of Eagle Ventures who collectively decided to make a $420,000.00 offer on the two properties. When Mr. Cousins contacted Sterling to make an offer on the two properties on behalf of Eagle Ventures, he found out that there was a pending purchase offer on the two properties. Subsequently, Mr. Cousins approached Leo Hodgins to find out what had happened to their offer. Leo Hodgins said he would look into the matter and get back to him. In March 1992, Leo Hodgins informed Mr. Cousins that he submitted an all-cash offer of $420,000.00 to purchase both properties because "it was too good a deal to pass up." He later told Mr. Cousins that Westinghouse accepted his offer, and Mr. Hodgins then offered to sell 3330 Lake Villa to Eagle Ventures for $175,000.00.
In April 1992, Mr. Hodgins and his brother, Paul, created a limited partnership, known as 4141 Vets Limited Partnership, to purchase the property along with the general partner, Realty Properties, Ltd., of which Mr. Leo Hodgins was president. The purchase agreement between Mr. Hodgins and Westinghouse specifically stated that Mr. Hodgins was not Westinghouse's agent. In fact, a sales commission was paid to RVI. In May of 1992, Joseph Landry submitted an offer of $425,000.00 *866 on behalf of Eagle Ventures to Constant G. Marques, the attorney scheduled to close the sale to Mr. Hodgins in the event Leo Hodgins' sale did not materialize. On May 7, 1992, Westinghouse sold 3330 Lake Villa to 4141 Vets Limited Partnership for $65,000.00 and sold 4141 Veterans to the same limited partnership for $355,000.00.
Following the sale, plaintiffs, Don Cousins, Eagle Ventures, Inc. and Veterans Villa Properties, Inc. filed the instant suit against defendants, Leo Hodgins, Paul Hodgins[2], Realty Ventures, Inc. and 4141 Vets Limited Partnership. Plaintiffs suit alleged that defendants breached their fiduciary duties to them by failing to timely submit a purchase offer to Westinghouse, failing to communicate Westinghouse's response to their offer, discouraging plaintiffs from submitting a supplemental/amending purchase offer, failing to reduce such purchase offer to writing despite their request to do so, failing to disclose known material defects regarding the condition of the real estate at issue, acting in a dual capacity as plaintiffs' agent and an undisclosed principal, failing to inform plaintiffs of their interest in the property at issue, and failing to divulge to plaintiffs on whose behalf defendants acted and if being compensated by more than one party.
This case proceeded to trial before a jury on May 23, 2000. After seven days of trial, the jury returned a verdict in favor of plaintiffs, Eagle Ventures, Inc. and Veterans Villa Properties, Inc. and against Leo Hodgins, Realty Ventures, Inc. and 4141 Vets Limited Partnership and awarded damages in the amount of $1,750,000.00, with interest from the date of judicial demand. Thereafter, defendants moved for a JNOV and for a new trial, both of which the trial judge denied. The trial court adopted the jury's verdict in a final judgment on July 13, 2000. The judgment stated:
1) Defendant, Leo Hodgins, breached his duty owed to Eagle Ventures, Inc. and Veterans Villa Properties, Inc.
2) Defendant, Realty Ventures, Inc. beached its duty owed to Eagle Ventures, Inc. and Veterans Villa Properties, Inc.
3) Defendant, 4141 Vets Limited Partnership beached its duty owed to Eagle Ventures, Inc. and Veterans Villa Properties, Inc.
4) The aforementioned breach of duty owed by defendant, Leo Hodgins to Eagle Ventures, Inc. and Veterans Villa Properties, Inc. caused damages to Eagle Ventures, Inc. and Veterans Villa Properties, Inc.
5) Defendant, Leo Hodgins acted fraudulently or intentionally in breaching his duty owed to Eagle Ventures, Inc. and Veterans Villa Properties, Inc.
6) Defendant, Realty Ventures, Inc. acted fraudulently or intentionally in breaching its duty owed to Eagle Ventures, Inc. and Veterans Villa Properties, Inc.
7) Defendant, 4141 Vets Limited Partnership acted fraudulently or intentionally in breaching its duty owed to Eagle Ventures, Inc. and Veterans Villa Properties, Inc.
8) The breach of duty owed by defendants, Leo Hodgins, Realty Ventures, Inc. and 4141 Vets Limited Partnership caused damages to Eagle Ventures, *867 Inc. and Veterans Villa Properties, Inc. in the amount of $1,750,000.00 (one million seven hundred fifty thousand dollars).
Defendants filed this suspensive appeal. Plaintiffs answered the appeal.
ASSIGNMENTS OF ERROR
The parties assert the following:
1. The trial court and the jury committed errors of law in finding that the defendants owed a duty to the plaintiffs to protect them against the harm they allege under the circumstances in this case.
2. The trial court erred and the jury was manifestly wrong in finding that the defendants breached any duty to the plaintiffs.
3. The jury was manifestly erroneous in finding that the conduct of defendants was the cause in fact of the harm allegedly suffered by the plaintiffs.
4. The court erred as a matter of law and the jury was manifestly erroneous in finding that cause, duty and a breach of duty existed with respect to 4141 Vets Limited Partnership.
5. The jury was manifestly wrong in awarding damages of $1,750,000.00 and the trial court erred in allowing hearsay testimony as to valuation and expert testimony of fair market value as of the date of trial.
6. The trial court erred when it did not allow testimony of an offer by defendants to sell 3330 Lake Villa to plaintiffs for $79,000.00.
7. The trial court erred by instructing the jury as to the incorrect measure of damages.
8. The trial court erred in allowing evidence of non-binding trade association code of ethics to form the basis of expert's testimony and jury instructions regarding duty.
9. The trial court erred by instructing the jury that defendants had a fiduciary duty to plaintiffs.
10. Plaintiffs assert the jury miscalculated damages by not awarding lost profits to them.
DISCUSSION
As a preliminary matter, we note that defendants filed an exception of no right of action in with this court contending that Don Cousins and Eagle Enterprises, Inc.[3] never assigned their potential rights against Leo Hodgins to Eagle Ventures, Inc. or Veterans Villa Property, Inc. Plaintiffs argue defendants have previously filed this exception three times in the trial court. We referred this exception to the merits of this appeal. Our review of the record reveals ample support to deny that exception.
Turning to the substance of this appeal, we point out that a jury evaluated all of the evidence presented for seven days before returning a verdict in favor of plaintiffs, Eagle Ventures, Inc. and Veterans Villa Properties, Inc. It is well settled that a court of appeal may not set aside a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d *868 840 (La.1989). The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Id. In applying the manifestly erroneous-clearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo. Id.
The proper standard of review is whether the trial court committed an error of law or made a factual finding which is manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). If the trial court's decision is reasonable in light of the record reviewed in its entirety, this court may not reverse even if we would have weighed the evidence differently. Id. Nevertheless, when the court of appeal finds that a reversible error of law or manifest error of material fact was made in the trial court, it is required, whenever possible, to redetermine the facts de novo from the entire record and render a judgment on the merits. Id.
Duty/Breach
Defendants argue that the trial court and jury committed a reversible error of law in finding they owed a duty to plaintiffs and breached said duty in this case. Defendants note that in 1991, Louisiana law provided that in the absence of an agreement, a real estate agent was presumed to be the property seller's agent. However, in 1992, the law was revised to protect the buyer's rights in a real estate agency relationship. La. R.S. 37:1431. The record reflects that Leo Hodgins expressly denied ever being Westinghouse's agent in connection with his offer to purchase the property at issue. Since the breach at issue occurred prior to 1992, we look to the jurisprudence for guidance in this case.
The precise duties of a real estate broker must be determined by an examination of the nature of the task the real estate agent undertakes to perform and the agreements he makes with the involved parties. Latter & Blum, Inc. v. Richmond, 388 So.2d 368 (La.1980). In the instant case, Leo Hodgins accepted Mr. Cousins' request to find commercial real estate for Eagle Ventures to purchase by turning his attention to 3330 Lake Villa. In Amato v. Latter & Blum, Inc., 227 La. 537, 79 So.2d 873 (La.1955) the Louisiana Supreme Court found that a real estate broker breached his duty to the public based on the real estate licensing statute when he failed to transmit an offer to his principal, the prospective vendor. Twenty years later, the Louisiana Supreme Court found a breach of duty on the part of a broker employed to find a certain type of property but arranged for a friend to buy the property first and then resold it to the purchaser for an inflated price. Uhlich v. Medallion Realty, Inc., 338 So.2d 701 (La. 1976). The jurisprudence also sets forth the types of duties expected of a real estate agent. For example, a real estate agent may be found liable where he or she does not timely communicate an offer and that failure to communicate results in damages to the client. See generally, Burdon v. Harvey, 385 So.2d 514 (La.App. 4 Cir.), writ refused, 393 So.2d 742 (La. 1980). Similarly, a real estate broker has been found to have a duty to communicate to his principal all offers received and may *869 be liable in damages for failure to do so. Leggio v. Realty Mart, Inc., 303 So.2d 920 (La.App. 1 Cir.1974) writ denied, 307 So.2d 629 (La.1975). Moreover, a realtor has a duty to relay accurate information about property, a duty which extends to both vendor and purchaser, and may be held liable if such duty is breached. Guidry v. Barras, 368 So.2d 1129 (La.App. 3 Cir. 1979).
At trial, defendants presented testimony of Timothy Burgmeier to support its contention that a duty did not exist in this case. He testified there was no written brokerage agreement between Leo Hodgins and Eagle Ventures or a listing agreement between Westinghouse and Leo Hodgins. Next, plaintiffs were not likely to pay Leo Hodgins for his services. Moreover, Leo Hodgins could have presumably been Westinghouse's agent because Westinghouse approached him about the property before he approached Mr. Cousins. Mr. Burgmeier opined that Leo Hodgins had no duty to tell plaintiffs if 3330 Lake Villa was back on the market after October, 1991, because he communicated Westinghouse's inability to sell the property at the time of the offer to plaintiffs, and Mr. Cousins was never his client. Thus, at the time he purchased the property in May 1992, he had no further duty to plaintiffs. On cross-examination, Mr. Burgmeier testified that he was unaware of Russell Day's affidavit that stated he contacted Mr. Hodgins in early 1992 to tell him that Westinghouse would not consider the Cousins' offer on 3330 Lake Villa because it only wanted to sell that property as part of a package. Likely, the jury concluded that Mr. Burgmeier's conclusion that Leo Hodgins was not plaintiffs' agent was unreasonable under the circumstances. Our review of the record supports such a determination.
Plaintiffs' expert, Elizabeth Bulcher, testified that the documentary evidence indicated that Leo Hodgins knew plaintiffs were still interested in 3330 Lake Villa Drive at the time he began to negotiate the purchase of both properties for himself. Thus, he was violating Louisiana law prohibiting a real estate agent or broker from acting in a dual capacity and for more than one party in this transaction. Moreover, Leo Hodgins falsely represented to plaintiffs that Westinghouse was not willing to sell 3330 Lake Villa by failing to inform them when the property became available even though the property was part of a package. She opined that based on the relationship between plaintiffs and Leo Hodgins, he had a duty to inform plaintiffs of the package deal because it was a verbal counter offer and disclose to them his personal interest in the property. Further, despite plaintiffs' request to do so, Mr. Hodgins failed to reduce plaintiffs' subsequent offer with an increased purchase price to writing. Rather, he resubmitted the original offer. Ms. Bulcher also testified that Mr. Hodgins' conduct violated the Code of Ethics as set forth by the National Association of Realtors. Defendants objected to Ms. Bulcher's reliance on the National Realtors trade association code of ethics in forming her opinion in this case. We note that it is in the jury's purview to give credence to her testimony. Thus, we cannot say the trial court abused its discretion in so allowing her to testify.
Plaintiffs' argued at trial that Leo Hodgins committed a breach of his fiduciary duty to them in several respects: failing to timely submit the purchase offer to Westinghouse; failing to communicate Westinghouse's response to their offer; discouraging plaintiffs from submitting a supplemental/amending purchase offer; failing to reduce such purchase offer to writing despite their request to do so; failing to disclose known material defects *870 regarding the condition of the real estate at issue; acting in a dual capacity as plaintiffs' agent and an undisclosed principal; failing to inform plaintiffs of their interest in the property at issue; and failing to divulge to plaintiffs on whose behalf defendants acted if being compensated by more than one party. Defendants argue they owed no further duty to plaintiffs after the June purchase offer for 3330 Lake Villa was submitted to Westinghouse. Once Westinghouse responded that it could not sell the property due to the property management agreement with Tonti, Leo Hodgins relayed this information to Don Cousins. Plaintiffs contend that the agent/client relationship persisted far beyond that point based on Leo Hodgins' resubmission of Eagle Ventures' offer in October. They argue that the information regarding the package sale of 3330 Lake Villa and 4141 Veterans Boulevard constituted a counter-offer by Westinghouse that should have been communicated to Mr. Cousins. Mr. Cousins' trial testimony indicates to us that Leo Hodgins continued to act as Eagle Ventures' agent until March 1992. At no time prior to March did Leo Hodgins in any way indicate to Mr. Cousins that he was no longer Eagle Ventures' agent. On the contrary, Leo Hodgins regularly discussed 3330 Lake Villa with Mr. Cousins whenever the two men were together.
In our opinion, the trial testimony demonstrates that, as late as February or March of 1992, Mr. Cousins was still communicating with Leo Hodgins regarding the status of his offer and Leo Hodgins was still discussing the Eagle Ventures' offer with Westinghouse as late as January 1992. We believe Mr. Cousins acted consistently with his belief that Leo Hodgins was acting as his agent with Westinghouse at that time, while Leo Hodgins did nothing to dispel that belief. Rather, Leo Hodgins' own trial testimony underscores that fact that Mr. Cousins continued to follow up with him about 3330 Lake Villa and that Leo Hodgins continued to entertain these discussions as if nothing had changed between them. During some of that time, Leo Hodgins was armed with the information that 3330 Lake Villa was only for sale as a package with 4141 Veterans Boulevard and was covertly planning to acquire the property himself. He admitted that he became interested in purchasing the property himself in January 1992, but did not tell Mr. Cousins what his intentions were until March of 1992. Regardless of his belief that plaintiffs may not have been interested once they learned of the package sale, Leo Hodgins nonetheless had a duty to give them full disclosure about the property. Thus, he intentionally withheld a key piece of information regarding the very property that initiated the relationship between him and plaintiffs. At that point, Leo Hodgins could have and should have informed plaintiffs that he was interested in the property in light of his discovery of the package deal. It is clear that Mr. Hodgins recognized the purchase of these two properties to be a good deal. Perhaps, he failed to tell plaintiffs about the package deal because he wanted no competition or interference from them. Despite his contention that plaintiffs were not in the financial position to conclude the property purchase, he still chose not to tell them that the property they had made an offer on was for sale only with its neighboring property. Under cross-examination, Leo Hodgins admitted that he never told Don Cousins or anyone else associated with Eagle Ventures about Westinghouse's decision to sell the properties together prior to March 1992. Leo Hodgins' failure to communicate the package sale to plaintiffs the moment he learned of it constituted a breach of his fiduciary duties to them. Leo Hodgins' *871 duty was to give plaintiffs the information that Westinghouse rejected their offer for a single property sale and allow them to decide whether they wished to purchase both properties.
It is not for this Court to decide why Leo Hodgins did not tell Don Cousins about the existence of the package deal or his interest therein. Nor was the jury given such a task. Rather, the jury was charged with the duty to listen to all of the testimony. The jury gave credit and greater weight where it was due and rendered its verdict in light of the law as instructed to it. After conducting our own review of the voluminous record in this case, we conclude the jury's finding that the defendants fraudulently breached their fiduciary duty to plaintiffs is not manifestly erroneous.
With respect to 4141 Vets Limited Partnership, we note Louisiana courts are a shareholder, officer, or director of a corporation personally liable for corporate obligations, in the absence of fraud, malfeasance, or criminal wrongdoing. Deroche v. P & L Const. Materials, Inc., 554 So.2d 717 (La.App. 5 Cir.1989); writ denied, 559 So.2d 1359 (La.1990).
In this case, Leo Hodgins used the 4141 Vets Limited Partnership (of which he is a majority shareholder) as the vehicle to purchase the properties at issue. This entity was created to own these two properties. Thus, he cannot use this entity to insulate himself from his fiduciary duties to plaintiffs. Accordingly, the jury's verdict as to that entity was not manifestly erroneous.
Trial Testimony
We consider it noteworthy that Paul Hodgins testified that Russell Day was initially going to have a one-third interest in the two properties for facilitating the deal for Leo. At some point, he declined ownership and sought a $25,000.00 payment from 4141 Vets Limited Partnership instead. Leo Hodgins testified that the limited partnership hired and paid Mr. Day through his company TCR Services to assist it in reducing its real estate taxes. Leo Hodgins testified that in 1992 the taxes on the property were $17,273.81 and that in 1993 the tax was reduced to $15,840. Thus, he paid Russell Day for his assistance with the tax reduction, not for any assistance in the acquisition of the real estate at issue. Paul Hodgins testified that it was his understanding from Leo that Mr. Day was being compensated for helping close this deal. In fact, Leo and Paul both testified that four checks were written to TCR Services totaling over $25,000.00. In our opinion, the amount of these payments to Mr. Day through TCR for the alleged services rendered is very suspect. This Court has trouble reconciling that anyone with even average business acumen would consider such a payment reasonable in light of the fact that defendants realized less than $2,000.00 a year in tax reductions.
Defendants contend the trial court erred by not allowing testimony of defendants' offer to sell 3330 Lake Villa to plaintiffs for $79,000.00. We note that the trial court allowed defendants to proffer this testimony. However, it deemed the testimony was inadmissible because the offer constituted a settlement of future claims against the defendants. Our review of the record reveals no evidence to contravene the trial court's ruling.
Jury Instructions
Defendants argue that the trial court erred by instructing the jury that they had a fiduciary duty to plaintiffs. The instructions complained of are as follows.

*872 The precise duty of a real estate broker must be determined by an examination of the nature of the task the real estate agent undertakes to perform and the agreements he makes to the involved parties. [Citation omitted]
A Real Estate Broker is a trained professional who holds himself out as trained and experienced to render a specialized service in real estate transactions. The broker stands in a fiduciary relationship to his client and is bound to exercise care, skill and diligence in the performance of his duties. [Citations omitted]
A real estate agent cannot take any advantage of his position to speculate for his gain. A real estate agent owes a duty of loyalty which includes the duty to be truthful and forthright with the client while engaging in his business or acting for him. [Citation omitted]
A real estate agent has a fiduciary duty to fully inform his client of all facts relating to the subject matter of the agency which are material for the client to know for protection of his interest. [Citations omitted]
Even if a real estate agent is not the agent of the purchaser, the real estate agent nonetheless, still has a duty to the purchaser. The real estate agent will be held liable in damages to a nonclient purchaser if he breaches that duty by committing fraud or negligent misrepresentation. [Citations omitted]
A real estate agent has a specific duty to relay accurate information about the property, a duty which extends to both seller and purchaser, and he may be held liable for negligent misrepresentations if such duty is breached. [Citations omitted]
A real estate agent's duty includes the responsibility to convey offer and counteroffers between the parties and he may be held liable for damages for his failure to do so. [Citations omitted]
The basis for holding a Real Estate Broker responsible is the Louisiana Real Estate License Law, which imposes a duty upon a broker. [Citation omitted]
Realtors shall avoid exaggeration, misrepresentation, or concealment of pertinent facts relating to the property or the transaction. [Citation omitted]
Trial court erred because it instructed the jury as to the incorrect measure of damages.
[A]n agent is bound to restore to his client whatever he has received by virtue of his agency, even if he has received it unduly. [Citations omitted]
Louisiana jurisprudence is well established that an appellate court must exercise great restraint before it reverses a jury verdict because of erroneous jury instructions. Nicholas v. Allstate Ins. Co., 99-2522 (La.8/31/00), 765 So.2d 1017. The basis for this rule of law is that trial courts are given broad discretion in formulating jury instructions. Id. However, when a jury is erroneously instructed and the error probably contributed to the verdict, an appellate court must set aside the verdict. Id. Ultimately, the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice. Id. We note that the trial court conducted an extensive review of the jury instructions with all of the parties. Looking at the jury instructions on the whole, we conclude the jury was properly instructed.
Damages
Defendants assert the jury wrongly award plaintiff $1,750,000.00 in damages, further arguing that the trial court erred in denying his Motion in Limine to limit the testimony of plaintiffs' real estate *873 expert, Dr. Wade Ragas, regarding the fair market value of the property at the time of trial. The trial court denied Hodgins Motion in Limine, and Ragas was allowed to testify that, based upon his valuation of the properties as of the date of trial, $2,185,000.00, and the original cost to defendants' of the property, $420,000.00, the defendants had realized an increase in the value of the buildings of $1,765,000.00. By this assignment, defendants specifically argue that it was error for the trier of fact to consider the fair market value of the property on any date except May 7, 1991 in calculating the issue of damages in connection with a bad faith breach of contract.
In Womack v. Sternberg, 247 La. 566, 172 So.2d 683 (1965), the Louisiana Supreme Court considered a similar issue of property valuation in light of the exchange of two homes between parties. In that case, the court determined that the trial court erred in considering expert testimony regarding the fair market value of the property as it existed at the time of trial in computing profit allegedly lost as a consequence of defendant's default. The court noted:
The general principle is that the measure of damages for breach of an obligation is the sum which will place the plaintiff in as good a position as he would have been if the obligation had been fulfilled. 3 Williston on "Sales", Sec. 599, page 293.
Similarly, in this case, we find that the trial court committed reversible error in allowing Dr. Ragas to testify regarding the value of the property in question at the time of trial.
Defendants further argue that the jury erred in finding defendants' conduct caused any harm to plaintiffs. However, as previously discussed, the record reflects that plaintiffs presented testimony to the contrary.
Plaintiffs assert that the jury erred in not awarding lost income. We find that to award plaintiffs lost income would come as a windfall to them because they would reap all the benefits that flowed from ownership of these properties without having had to endure the associated financial risks and responsibilities associated therewith. The record demonstrates that Leo Hodgins undertook renovations on the properties to increase both the rental income and fair market value of the real estate. While this Court agrees defendants' conduct was fraudulent, we believe to award lost profits to plaintiffs would appear punitive in nature. The jury's award does not indicate whether it did or did not award lost profits to plaintiffs. Thus, we reject plaintiffs' argument that the jury erred by not awarding lost profits to them.
For the reasons assigned, the award of damages made by the jury is affirmed in part and reversed in part, and the case is remanded to the district court for determination of damages in accordance with the value of the property in question at the time the taking occurred.
Accordingly, the judgment is reversed in part, affirmed in part, and remanded.
AFFIRMED IN PART; REVERSED IN PART; REMANDED.
CANNELLA and McMANUS, JJ., concurs in part and dissents in part.
CANNELLA, J., concurs in part and dissents in part.
I concur in the majority opinion on the liability issues. However, I dissent from the majority opinion which remands the case "to the district court for determination of damages" because I find no basis in law for the majority action.
*874 The majority seems to find an evidentiary ruling error in the district court's ruling allowing the Plaintiffs' expert to testify regarding the value of the building at the time of trial. This finding further seems to be the basis for the remand, although not expressed. I disagree for two reasons.
First, I find no error in the ruling. The jury found, and this court has affirmed the finding, that the Plaintiffs were injured by the fault of the Defendants. Plaintiffs then attempted to prove their damages by expert testimony regarding the value of the buildings at several different time periods from the time of the taking through the time of trial. I find no error in Plaintiffs' presentation of this evidence or the district court's ruling allowing it. At that juncture of the case, it was incumbent upon the Defendants to show why the value of the building at the time of trial would not be an appropriate measure of damages and why a different measure would more accurately reflect the loss suffered. Defendants did not do this. That doesn't make Plaintiffs' expert's testimony inadmissible or insufficient.
Second, even if this evidentiary ruling was error, a remand for the district court to set damages is not appropriate. The jury, under general charges and general interrogatories, returned a damage award of $1,750,000. As pointed out by the majority with regard to the lost profits issue, we don't know what that award was based on, whether it was the valuation of the building at the time of trial or a different valuation with damages for lost profits.
Therefore, I do not find trial error that requires a remand of the case for a "determination of damages in accordance with the value of the property in question at the time the taking occurred." Rather, this court should, in accord with well settled appellate review principles, review the case in its entirety and determine whether the damage award is clearly wrong based on the evidence in the record and then, if so, set the damages based on the record in the case.
This was a jury trial. I know of no legal principle that allows remand for a "determination of damages" absent the grant of a new trial, which will, in this case, require the empaneling of a new jury, in a case that has gone on for over 10 years. The majority, however, does not make the legal determination that a new trial should be granted. Absent that, it is the duty of this court, after a finding that the award is manifestly erroneous, to set the damages based on the record before it.
Accordingly, I concur in the majority opinion on liability and I dissent from the majority opinion on damages, being of the view that absent a finding that the Defendants are entitled to a new trial or that the jury verdict is manifestly erroneous, there is no legal basis for setting aside the jury verdict and remanding the case "to the district court for determination of damages."
McMANUS, J., concurs in part and dissents in part:
I concur with the jury's finding that Leo Hodgins breached his fiduciary duties to the plaintiffs in this case. However, I respectfully dissent from the majority opinion on the issue of damages, concluding that the plaintiffs proved their damages and that the jury award was not manifestly erroneous.
I respectfully disagree with the majority's position that it was reversible error for Dr. Wade Ragas to testify regarding the fair market value of the property at the time of trial. The jury did not receive an instruction to use that number to calculate damages. Moreover, there is nothing in the record to suggest how the jury *875 calculated the damage award. The majority assumes that the jury used the full measure of the property's value at the time of trial minus the purchase price. However, the jury may not have arrived at their total using any method we might attribute to them. We simply do not know. Be that as it may, I find no evidence in the voluminous record to suggest that the $1,765,000.00 award to plaintiffs was unreasonable or manifestly erroneous, nor does the majority opinion make an express determination that the award was manifestly erroneous.
It is my considered belief that the fair market value information was properly presented to the jury and constitutes the true measure of how Mr. Hodgins benefited from his deliberate fraud. Juries are free to evaluate all testimony, lay and expert. Webb v. Horton, 01-978 (La.App. 5 Cir.1,2/13/02), 812 So.2d 91. I agree with Judge Cannella in all respects and reiterate that defendants were responsible to present evidence to counter plaintiffs' view of damages and did not do so. I fail to see how remanding this case to the district court for a determination of damages (without any legal authority) will produce a more palatable damage award when that responsibility rests on the majority's shoulders.
While I respectfully disagree with the majority's ruling that the jury award is somehow flawed, I suggest that the award could be structured any number of ways: the full measure of the property's value at the time of trial minus the purchase price, the value of the property at the time of acquisition plus an award of lost profits or the value of the property at the time of acquisition plus interest. This information can be gleaned from the record as it now appears and does not require another proceeding.
The majority's reliance on Womack is proper. A damage award in this case should be one that will "place the plaintiff in as good a position as he would have been if the obligation had been fulfilled." Thus, my position is to affirm the jury's verdict and award as entered without further compensation to plaintiffs or a reduction of damages. Therefore, I respectfully disagree with the majority on the issue of damages and believe this case should be affirmed.
CANNELLA, J., concurs.
MCMANUS, J., concurs in part and dissents in part.

ON REHEARING

AMENDED AND AFFIRMED
GOTHARD, J.
We grant the rehearing for the limited purpose of considering the issue of damages.
At trial, defendants sought to limit the testimony of plaintiffs' real estate expert regarding the fair market value at the time of trial. The trial court denied defendants' motion, and plaintiffs' expert was allowed to testify that, based on the valuation of the property at the time of trial, the fair market value of the property had increased by $1,765,000.00.
The plaintiffs are entitled to damages based on the fair market value of the property on the date of defendants' purchase, plus interest. Langendorf v. Administrators of the Tulane Education Fund, 361 So.2d 905 (La.App. 4 Cir.1978); Scurria v. Hodge, 31,207 (La.App. 2 Cir. 10/30/98), 720 So.2d 460. It was error for the jury to consider the value of the property at the time of trial in awarding damages.
*876 Where the record is complete, the court of appeal must consider the issues and decide the matter. Daigle v. Coastal Marine, Inc., 488 So.2d 679 (La.1986). In this case, the full record is before us. Thus, we are obligated to make a determination of damages on the record before us.
The plaintiffs used expert testimony to the value of the subject property at the time of sale and at the time of trial. Defendants objected to the use of appraisals made at the time of the sale. Those appraisals were prepared on behalf of the sellers of the property. Plaintiffs' expert stated that the appraisals were done in a reasonable manner, were well documented, and were indicative of the market at that period of time. Defendants presented no evidence to show why those appraisals were erroneous or do not adequately reflect the value of the property at the time of the sale. The plaintiffs' expert stated that the appraisals showed that the property had a value of $1,210,000.00, and that defendants purchased the properties for $420,000.00. Accordingly, the record supports an award of $790,000.00, plus interest from the date of sale.
For these reasons, we amend the judgment to award plaintiffs damages of $790,000.00 plus interest.
CANNELLA, J., concurs.
McMANUS, J., concurs in part and dissents in part.
CANNELLA, J., Concurs.
I concur in the Court's determination on rehearing that the record supports a damage award of $790,000 plus interest from the date of sale.
McMANUS, J., Concurs in Part and Dissents in Part.
I concur with the grant of the rehearing, maintaining the position expressed in my dissent to the original opinion that no legal authority exists to remand this case to the trial court to recalculate damages.
However, I respectfully disagree with the majority's opinion on this rehearing that it was error for the jury to consider the value of the property at the time of trial and I dissent from the rehearing majority's reduction of the jury's award. Not only did defendants object to testimony regarding the fair market value of the property at the time of trial, they also objected to the use of appraisals outlining the value of the property at the time of acquisition. I understand why. If the goal is to "place the plaintiff in as good a position as he would have been if the obligation had been fulfilled," perhaps the jury award should be increased. If the obligation had been fulfilled and plaintiffs had acquired the real estate at issue, their position would be far better than $790,000.00 plus interest. They might have even ended up in a position greater than $1,765,000.00. Quite simply, no factual or legal grounds support the rehearing majority's decision to substitute its evaluation of damages for the jury's verdict on damages, reached after full deliberation.
Thus, I do not find the jury award of $1,765,000.00 to be manifestly erroneous in light of the jury's finding of fraud and our affirmation thereof. I would affirm the jury award as entered without further compensation to plaintiffs or a reduction in damages. Therefore, I respectfully disagree with the majority on the issue of damages and believe this case should be affirmed.
NOTES
[1] Also around that time, Leo Hodgins acted as Mr. Cousins' agent by submitting an offer for him on a residential property. However, Mr. Cousins did not purchase that property.
[2] At some point, Paul Hodgins discovered that although he owned 50% of 4141 Vets Limited Partnership, he had no voting rights which therefore enabled Leo to drastically reduce his ownership in partnership. A dispute between the two brothers ensued; and, as a result, Paul filed suit against Leo. Paul testified as a witness for the plaintiffs and entered into a Mary Carter agreement with them.
[3] Eagle Ventures, Inc. was mistakenly referred to as Eagle Enterprises, Inc. on the June 5, 1991 purchase agreement. However, the entity was formed as Eagle Ventures, Inc. Defendants admitted in previous pleadings in the record that they did not dispute the fact that Eagle Ventures was the proper party executing the purchase agreement.