STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

* * * * * * *

2023 CA 0881

MICHAEL AND SUSAN SMITH

VERSUS

BRADLEY AND ANGELIQUE GRANTHAM,
AND VERONICA MOSGROVE

JUDGMENT RENDERED: _____SEP 0 4 2024_____

* * * * * * *

Appealed from the Twenty-Third Judicial District Court
Parish of Ascension • State of Louisiana
Docket Number 127,172 • Division C

The Honorable K. Tess Percy Stromberg, Presiding Judge

* * * * * * *

| | |
|---|---|
| Carroll Devillier, Jr.<br>Danielle L. Borel<br>Candace B. Ford<br>Baton Rouge, Louisiana | COUNSEL FOR APPELLANTS<br>PLAINTIFFS—Michael Smith and<br>Susan Smith |
| Brian L. Glorioso<br>Richard A. Tonry, II<br>Raymond J. Brinson<br>Slidell, Louisiana | COUNSEL FOR APPELLEES<br>DEFENDANTS—Bradley Grantham<br>and Angelique Grantham |
| Michael P. Bienvenu<br>Baton Rouge, Louisiana | COUNSEL FOR APPELLEE<br>DEFENDANT—Veronica Mosgrove |

* * * * * * *

**BEFORE: WELCH, WOLFE, AND GREENE, JJ.**

Welch, Jr. agrees in part, dissents in part and assigns reasons.

**WOLFE, J.**

In this redhibition and negligent misrepresentation action arising from the sale of residential property, the buyers of a home challenge summary judgments rendered against them that dismissed their redhibition claims against the sellers and dismissed their negligent misrepresentation claim against the sellers' real estate agent. The buyers also challenge the denial of their own motion for summary judgment, wherein they sought a judgment determining their entitlement to a rescission of the sale or a reduction of the purchase price based on the sellers' failure to disclose a redhibitory defect and the negligent misrepresentation of the seller's real estate agent. Following our *de novo* review, we affirm.

## FACTS AND PROCEDURAL HISTORY

### *Background*

On July 5, 2016, Michael and Susan Smith (the buyers) and Bradley and Angelique Grantham (the sellers) signed a purchase agreement whereby the Granthams agreed to sell their home located in Prairieville to the Smiths in "as is" condition for $435,000.00. The Smiths' real estate agent was Meghan Peak—the daughter of Mrs. Smith and the stepdaughter of Mr. Smith. The Granthams' real estate agent was Veronica Mosgrove, who also served as their real estate agent when they purchased the property in 2015.

As required by Louisiana's Residential Property Disclosure Act, La. R.S. 9:3196, *et seq.* (the "RPDA"), the Granthams provided the Smiths with a "Property Disclosure Document for Residential Real Estate" (the "2016 disclosure") regarding the condition of the property.[1] Pertinent to this appeal, the Granthams denied experiencing any flooding, water intrusion, accumulation, or drainage problem with respect to the land; denied that any structure on the property had ever taken water by

---

[1] The Granthams executed the 2016 disclosure on May 4, 2016.

2

flooding (rising water or otherwise); and denied the existence of flood or other property damage related to the land or the improvements thereon.

The July 5, 2016 purchase agreement allowed the Smiths a twelve-day inspection and due diligence period, beginning on July 6, 2016. The Smiths hired Geaux Home Inspections, LLC to perform a general inspection of the property. On July 14, 2016, Inspector Richard Campbell conducted the inspection and thereafter issued an inspection report. Campbell did not note any property or structural damage related to flooding or mold in his inspection report. Following the inspection, the Smiths provided the Granthams with a list of twenty-one deficiencies they desired to be remedied, per the applicable provision in the purchase agreement. The Granthams agreed to the repairs and repaired or replaced all of those items.

Due to the historic flooding in Louisiana in August 2016, the purchase agreement was extended to accommodate the closing date. The property at issue is not located in a flood zone and did not flood in the 2016 flooding event, which was confirmed by the Smiths' lender.

After negotiations, the parties agreed to the final purchase price of $447,500.00. On August 22, 2016, the Smiths and the Granthams signed an act of cash sale, noting the sale was "AS IS, WHERE IS" and "WITH ALL FAULTS" and "without any warranty of any kind whatsoever[.]" The Smiths waived any redhibition claims or claims for a reduction in purchase price under the Louisiana Civil Code.

### *Smiths' Petition*

On October 29, 2019, the Smiths filed a petition in redhibition and negligent misrepresentation, naming the Granthams and Mosgrove as defendants. The Smiths alleged that, since purchasing the property in 2016, they had experienced water accumulation and drainage problems that caused significant issues, including the flooding of the home on June 6, 2019. Upon commencing repairs and remedial

3

measures after the 2019 flooding event, the Smiths alleged they discovered mold in the home located behind baseboards and cabinetry. The Smiths discovered holes in the sheet rock that had been obscured by baseboards and cabinets, which they alleged were consistent with holes that would be made in an effort to remediate flood damages. The Smiths claimed this evidence showed "the [p]roperty previously flooded." The Smiths alleged that the "previous flood damages" were unknown to them at the time of their purchase of the property.

### *Redhibition Claim against the Granthams*

The Smiths asserted a redhibition claim against the Granthams, alleging that the Granthams had knowledge at the time they executed their 2016 disclosure that the property had previously flooded and sustained flooding, water accumulation, and drainage problems. The Smiths claimed the Granthams misrepresented the condition of the property and failed to accurately and truthfully disclose known flooding issues. The Smiths averred that had they known of the defective condition of the property, they would not have purchased the property.

The Smiths alleged that in the 2016 disclosure, in response to Section 1(5), "Has any flooding, water intrusion, accumulation, or drainage problem been experienced with respect to the land?", the Granthams answered "N." (*i.e.*, "no"). In response to Section 3(12), "Has any structure on the property ever taken water by flooding (rising water or otherwise)?", the Granthams answered "N." In response to Section 6(31), "Has there been property damage related to the land or the improvements thereon, including, but not limited to … flood … or other property damage?", the Granthams gave no response. We note the record shows the Granthams later amended their 2016 disclosure, prior to the sale, to answer "N" to Section 6(31).

The Smiths further alleged that the Granthams' 2016 disclosure directly contradicted several prior disclosures made in conjunction with previous sales of the

4

property, including the disclosure prepared by the previous seller, Doherty "Mike" Jarreau, in anticipation of the Granthams' purchase of the property in 2015. In the 2015 disclosure, Jarreau answered "Y" (*i.e.*, "yes") to all of the disclosure questions (*i.e.*, Section 1(5), Section 3(12), and Section 6(31)) regarding flooding, water intrusion, accumulation, drainage problems, and property damage related to flooding. The 2015 disclosure included a handwritten note by Jarreau describing an earlier flooding event: "City Master Ditch stopped up with Carpets[.] Trash man-made. House is not [in] Flood Zone."

Alleging the defective condition of the property remained unresolved and that they had incurred costs in remediating and repairing flood damage and mold, the Smiths claimed the Granthams were liable to them for redhibition, breach of contract, and breach of implied and express warranties. The Smiths claimed the alleged defect in the property met the definition of a redhibitory defect. The Smiths claimed entitlement to a rescission of the sale, damages incurred as a result of the Granthams failure to disclose the defective condition of the property, and attorney's fees and costs as a result of the Granthams' bad faith dealings.

### *Negligent Misrepresentation Claim against Mosgrove*

The Smiths also asserted a negligent misrepresentation claim against Mosgrove, alleging that she had personal knowledge of the defective condition of the property—specifically, that the property had previously flooded. The Smiths claimed that, as the sellers' real estate agent, Mosgrove also owed a duty to communicate accurate information to the Smiths, as buyers, including a duty to inform the Smiths of any material defects that were not discoverable by simple inspection. The Smiths claimed Mosgrove breached her duty when she failed to disclose to the Smiths that the property had previously flooded. The Smiths claimed that, if she had disclosed the prior flooding, they could have taken additional steps during their investigation of the property to determine whether the property

5

sustained flood damage. The Smiths alleged they reasonably relied upon Mosgrove's representations regarding the condition of the property, since the property was not located in a flood zone at the time. The Smiths claimed they incurred damages as a result of Mosgrove's alleged negligent misrepresentation.

*Answers*

Mosgrove answered the Smiths' petition, asserting general denials. The Granthams answered the Smiths' petition, also asserting general denials. The Granthams also raised several affirmative defenses, including: the Smiths waived any redhibition claims in the purchase agreement; the Granthams owed no warranty to the Smiths for defects that were or should have been discovered during the inspection period prior to the sale; the Smiths waived any applicable warranties in the act of sale; any sustained damages were the fault of the Smiths, third parties, or the result of a mutual mistake, such that the Granthams were not liable to the Smiths; and the Smiths failed to mitigate their damages.

***Cross Motions for Summary Judgment***

Pertinent to this appeal, the parties filed cross-motions for summary judgment. The Granthams filed a motion for summary judgment, seeking dismissal of all of the Smiths' claims against them. Mosgrove filed a motion for summary judgment, seeking a judgment dismissing the Smiths' negligent misrepresentation claims against her. The Smiths filed a motion for summary judgment, seeking a judgment determining their entitlement to a rescission of the sale of the property, or a reduction of the purchase price, based on the existence of a redhibitory defect, plus damages and attorney's fees incurred, as a result of the Granthams' failure to disclose the defective condition of the property and Mosgrove's negligent misrepresentation.

6

## *Trial Court's Ruling*

After a hearing on the cross motions, the trial court signed a judgment on May 2, 2023,[2] that granted the Granthams' and Mosgrove's motions for summary judgment, denied the Smiths' motion for summary judgment, and dismissed all of the Smiths' claims against the Granthams and Mosgrove.

In written reasons for judgment, the trial court stated that the issue before the court on the cross motions for summary judgment was whether the Smiths, through their agent Peak, were put on notice of any flooding issues with the property, such that any misrepresentation or suppression of the truth did not vitiate their consent to the sale of the property. The trial court held there were no genuine issues of material fact that the 2016 act of sale contained a waiver of redhibition and that the Smiths' agent, Peak, was in possession of the prior 2015 disclosure, which disclosed that the land had experienced flooding and a structure on the property had taken on water resulting in property damage caused by flooding. The trial court further found that, as a matter of law, Peak's possession of the 2015 disclosure, along with her readily available access through a real estate database to other prior disclosures (that also disclosed flooding issues) put Peak and the Smiths on notice of the flooding issues with the property, which should have then been investigated by the Smiths prior to their purchase of the property. The trial court held that Peak's notice of the defect was imputable to the Smiths through her agency and precluded any claim of negligent misrepresentation against Mosgrove.

As to Mosgrove's objections to portions of the deposition of Griffon, the trial court found that those portions of Griffon's deposition could not be considered for

---

[2] After the trial court signed a judgment on January 25, 2023, the parties filed a joint motion to amend that judgment out of an abundance of caution to prevent any possible remand by this court if the January 25, 2023 judgment lacked the appropriate decretal language. The trial court granted the joint motion and signed an amended, final judgment on May 2, 2023. See La. C.C.P. arts. 1918 and 1951; **Perez v. Louisiana Dep't of Pub. Safety & Corr.**, 2023-0979 (La. App. 1 Cir. 4/17/24), 2024 WL 1645376, *2 (unpublished).

7

purposes of summary judgment. The trial court held testimony that repeated statements made to Griffon were hearsay, and that any statement made by Griffon as to what he would have said—without having specific recollection of the statement—was speculative.

*Appeal*

The Smiths now appeal and contend that the trial court erred in: granting the Granthams' motion for summary judgment; granting Mosgrove's motion for summary judgment; determining that the Smiths had prior knowledge of the property's flooding issues; determining that their waiver was not vitiated by fraud; and making credibility determinations and weighing evidence on summary judgment.

## SUMMARY JUDGMENT LAW[3]

Appellate courts review the grant or denial of a motion for summary judgment *de novo* using the same criteria applied by the trial courts to determine whether summary judgment is appropriate. **Georgia-Pacific Consumer Operations, LLC v. City of Baton Rouge**, 2017-1553, 2017-1554 (La. App. 1 Cir. 7/18/18), 255 So.3d 16, 22, writ denied, 2018-1397 (La. 12/3/18), 257 So.3d 194. After an opportunity for adequate discovery, a motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(A)(3).

---

[3] Although the Legislature recently amended La. C.C.P. art. 966, those amendments are not applicable to the instant appeal. See 2023 La. Acts No. 317, § 1 (eff. Aug. 1, 2023) and 2023 La. Acts No. 368, § 1 (eff. Aug. 1, 2023). This court has determined that those amendments are substantive and cannot be applied retroactively. **Martin v. ISC Constructors, L.L.C.**, 2023-0707 (La. App. 1 Cir. 3/13/24), 387 So.3d 630, 634 n.5. See also La. C.C.P. art. 966, Comments--2023, Comment (f). Accordingly, in the instant matter, we apply the version of La. C.C.P. art. 966 in effect on January 13, 2023, when the cross motions for summary judgment were heard and submitted.

The burden of proof on a motion for summary judgment rests with the mover. La. C.C.P. art. 966(D)(1). Nevertheless, if the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense. Instead, after meeting his initial burden of showing that there are no genuine issues of material fact, the mover may point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, summary judgment shall be granted unless the adverse party can produce factual evidence sufficient to establish the existence of a genuine issue of material fact or show that the mover is not entitled to judgment as a matter of law. See La. C.C.P. art. 966(D)(1).

Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to the case. **Chapman v. Haynes**, 2022-0288 (La. App. 1 Cir. 9/16/22), 352 So.3d 1023, 1027.

## APPLICABLE LAW

### Redhibition and the RPDA

Under La. C.C. art. 2520, the seller warrants the buyer against redhibitory defects in the thing sold. A defect is redhibitory when the defect renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought it had he known of the defect. La. C.C. art. 2520. The existence of such a defect gives a buyer the right to obtain rescission of the sale. **Id.** A defect is also redhibitory when, without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it, but for a lesser price. **Id.** The existence of such a defect limits the right of a buyer to a reduction of the price. **Id.**

9

Under La. C.C. art. 2521, however, a seller owes no warranty for defects that were known to the buyer at the time of the sale or for defects that a reasonably prudent buyer should have discovered. Further, under La. C.C. art. 2548, a seller and buyer may agree to an exclusion or limitation of the warranty against redhibitory defects. The terms of the exclusion or limitation must be clear and unambiguous and must be brought to the attention of the buyer. La. C.C. art. 2548.

The seller bears the burden of proving the buyer has waived the warranty against redhibitory defects. **McDonald v. D'Amico**, 2023-0884, 2023-0885 (La. App. 1 Cir. 3/22/24), 385 So.3d 1162, 1168, writ denied, 2024-00444 (La. 6/19/24), 386 So.3d 674. A waiver of warranty against redhibitory defects is strictly construed against the seller. **Id.** And, under La. C.C. art. 2548, even when the parties agree to an exclusion or limitation of the warranty against redhibitory defects, such is not binding in circumstances where the seller has declared that the thing has a quality that he knew it did not have. **Id.** Stated differently, a seller who knows of a redhibitory defect, fails to disclose it, and instead obtains the buyer's waiver against redhibitory defects, commits fraud; and, such fraud invalidates the waiver. **Id.**

In addition to the above Civil Code articles regarding redhibition, the RPDA requires a seller of residential property to complete and deliver a property disclosure document (in a form prescribed by the Louisiana Real Estate Commission) to the buyer that discloses, at a minimum, "known defects" in the residential real property. La. R.S. 9:3196(2). A "known defect" is a condition actually known by the seller that has a substantial adverse effect on the property's value, significantly impairs the health or safety of the property's future occupants, or significantly shortens the property's expected normal life, if not corrected. See La. R.S. 9:3196(1). The seller shall complete the property disclosure document in good faith to the best of his belief and knowledge as of the date he completes and signs it. La. R.S. 9:3198(B)(1). However, a property disclosure document shall not constitute a warranty by the

seller. La. R.S. 9:3198(D)(1). The information contained therein is for disclosure purposes only and is not intended to be a part of any contract between the seller and buyer. **Id.** The property disclosure document may not be used as a substitute for any inspections or warranties that the seller or buyer may obtain, and the RPDA does not preclude the buyer's rights or duties to inspect the physical condition of the property. La. R.S. 9:3198(D)(2).

A seller shall not be liable for any error, inaccuracy, or omission of information required in the property disclosure document, if the error, inaccuracy, or omission was not a willful misrepresentation according to the best of the seller's information, knowledge, and belief. La. R.S. 9:3198(E)(1). However, a seller who makes a willful misrepresentation in a property disclosure document can be found liable for fraud. **McDonald**, 385 So.3d at 1168 (citing **Stutts v. Melton**, 2013-0557 (La. 10/15/13), 130 So.3d 808, 813 (interpreting La. R.S. 9:3200, which provides that the RPDA "shall not limit or modify any obligation between buyers and sellers created by any other statute or that may exist in law")). See also La. C.C. arts. 1953 and 1954 (relative to fraud).

The elements of a claim for willful, or intentional, misrepresentation are: (1) a misrepresentation of a material fact; (2) made with the intent to deceive; and (3) causing justifiable reliance with resultant injury. **Murray v. Bostwick**, 52,802 (La. App. 2 Cir. 8/14/19), 276 So.3d 1120, 1125. An obligor is in bad faith if he intentionally and maliciously fails to perform his obligation. La. C.C. art. 1997, Revision Comments--1984, Comment (b). The term "bad faith" means more than mere bad judgment or negligence; it implies the conscious doing of a wrong for dishonest or morally questionable motives. **Murray**, 276 So.3d at 1125.

11

## Negligent Misrepresentation

Real estate "agents"[4] play an important part in many real estate transactions. See Peter S. Title, "Generally," *Louisiana Real Estate Transactions*, LOUISIANA PRACTICE SERIES, 1 La. Prac. Real Est. § 12:1 (2d ed.) (November 2023 Update). The duties of a real estate agent are limited to those which can be analogically drawn from La. R.S. 37:1430, *et seq.*, the Louisiana Real Estate License Law, and from the customs and practices of real estate agents in general. See **Leggio v. Realty Mart, Inc.**, 303 So.2d 920, 923-24 (La. App. 1 Cir. 1974), writ denied, 307 So.2d 629 (La. 1975).

The duties of a real estate agent are also prescribed by La. R.S. 9:3891-3899, entitled "Agency Relations in Real Estate Transactions," which sets forth the obligations and liabilities between agents, clients, and other people involved in real estate transactions. See 1997 La. Acts, No. 31 (eff. March 1, 1998); **Hughes v. Goodreau**, 2001-2107 (La. App. 1 Cir. 12/31/02), 836 So.2d 649, 655 n.4, writ denied, 2003-0232 (La. 4/21/03), 841 So.2d 793. See also Title, "Generally," 1 La. Prac. Real Est. § 12:1. Enacted in 1997, this legislation created a comprehensive framework of law for real estate agent-assisted transactions that replaced the "patchwork quilt" of earlier statutes and decisions. See Peter S. Title, "Agency relations," *Louisiana Real Estate Transactions*, LOUISIANA PRACTICE SERIES, 1 La. Prac. Real Est. § 12:72 (2d ed.) (November 2023 Update).

A "licensee" is any person who has been issued a real estate license by the Louisiana Real Estate Commission as a real estate salesperson or a real estate broker. La. R.S. 9:3891(11). Louisiana Revised Statutes 9:3894 provides:

---

[4] An "agent" is a licensee acting under the provisions of the Louisiana Real Estate License Law in a real estate transaction. La. R.S. 37:1431(2). A "licensee" is any person who has been issued a license by the Louisiana Real Estate Commission to participate in any activity described in the Louisiana Real Estate License Law. La. R.S. 37:1431(14). A "real estate salesperson" is a person sponsored by a licensed real estate broker to participate in any activity described in the Louisiana Real Estate License Law. La. R.S. 37:1431(26).

A. Licensees shall treat all customers honestly and fairly and when representing a client in a real estate transaction may provide assistance to a customer by performing ministerial acts. Performing those ministerial acts shall not be construed in a manner that would violate the brokerage agreement with the client, and performing those ministerial acts for the customer shall not be construed in a manner as to form a brokerage agreement with the customer.

B. A licensee shall not be liable to a customer for providing false information to the customer if the false information was provided to the licensee by the licensee's client or client's agent and the licensee did not have actual knowledge that the information was false.

Under the general law of mandate, knowledge of an agent is imputed to the principal. **Khoobehi Properties, LLC v. Baronne Dev. No. 2, L.L.C.**, 16-506 (La. App. 5 Cir. 3/29/17), 216 So.3d 287, 298, writ denied, 2017-0893 (La. 9/29/17), 227 So.3d 288. See also La. C.C. art. 2985, *et. seq.* A real estate agent is not an "agent" of their clients within the purview of the mandate provisions of the Louisiana Civil Code. See **Verdin v. Rogers**, 2003-1457 (La. App. 5 Cir. 4/27/04), 873 So.2d 804, 807, writ denied, 2004-1231 (La. 9/24/04), 882 So.2d 1128; **Smith v. Remodeling Serv., Inc.**, 94-589 (La. App. 5 Cir. 12/14/94), 648 So.2d 995, 999; **Reeves v. Weber**, 509 So.2d 158 (La. App. 1 Cir. 1987); **Leggio**, 303 So.2d at 923-24. Thus, knowledge of a defective condition cannot be imputed to a client simply because their real estate agent was aware of the problem. **Frugé v. Hancock**, 94-730 (La. App. 3 Cir. 12/7/94), 647 So.2d 488, 492, writ denied, 95-0070 (La. 3/10/95), 650 So.2d 1181; **Mintz & Mintz Realty Co. v. Sturm**, 419 So.2d 981, 983 (La. App. 4 Cir.), writs denied, 423 So.2d 1163, 1164 (La. 1982). See also Title, "Generally," 1 La. Prac. Real Est. § 12:1.

A buyer's remedy against a real estate agent is limited to damages for fraud (intentional misrepresentation) under La. C.C. art. 1953 or for negligent misrepresentation under La. C.C. art. 2315. **Rabalais v. Gray**, 2014-552 (La. App. 5 Cir. 12/16/14), 167 So.3d 101, 107 (recognizing that the cause of action for

13

negligent misrepresentation was unaffected by the enactment of La. R.S. 9:3891-3899); **Duplechin v. Adams**, 95-0480 (La. App. 1 Cir. 11/9/95), 665 So.2d 80, 84, writ denied, 95-2918 (La. 2/2/96), 666 So.2d 1104; **Chmielewski v. Sowell**, 55,317 (La. App. 2 Cir. 11/15/23), 374 So.3d 404, 418. In the instant matter, the Smiths pled negligent misrepresentation. The action for negligent misrepresentation arises *ex delicto*, rather than from contract. **Riedel v. Fenasci**, 2018-0540 (La. App. 1 Cir. 12/28/18), 270 So.3d 583, 592. In order for a plaintiff to recover for negligent misrepresentation, there must be: (1) a legal duty on the part of the defendant to supply correct information; (2) a breach of that duty; and (3) damage to the plaintiff caused by the breach. **Riedel**, 270 So.3d at 592; **Chmielewski**, 374 So.3d at 418. Any alleged misrepresentations that relate to defects that are apparent and discoverable on simple inspection, when inspection is afforded the buyer before the sale, and where the buyer inspects the property before the sale, precludes the buyer from then complaining of negligent misrepresentation. In other words, there can be no recovery for negligent misrepresentation for defects discoverable by simple inspection where the buyer inspects the property prior to purchasing it. **Riedel**, 270 So.3d at 592.

A real estate broker or agent owes a specific duty to communicate accurate information about the property he is selling. This duty extends to the seller and the buyer. **Id.** See also La. R.S. 37:1455(A)(15) and (27) (authorizing the Louisiana Real Estate Commission to censure a real estate agent for making false representations or failing to disclose a known material defect during a real estate transaction). The failure to disclose to a buyer a known material defect regarding the condition of real estate of which the real estate agent has knowledge is among a licensee's duties analogically drawn from La. R.S. 37:1455 and from the customs and practices of real estate brokers and licensees in general. See La. R.S. 37:1455(A)(27); **Riedel**, 270 So.3d at 592. However, the duty to disclose any

material defects extends only to those defects of which the broker or agent is aware. **Riedel**, 270 So.3d at 592. As stated above in La. R.S. 9:3894(B), a real estate agent is not liable to a customer for providing false information if the agent did not have actual knowledge that the information was incorrect. **Chmielewski**, 374 So.3d at 418. Furthermore, real estate agents do not have a higher duty than the seller to supply accurate information. That would create a situation in which the agent had to independently verify information before conveying it to the buyer. **Id.**

## DISCUSSION

The Granthams sought a summary judgment on the basis that the Smiths would be unable to prove an essential element of their claim—that the Granthams' fraud vitiated the Smiths' waiver of any right to redhibition. The Granthams argued that the Smiths waived any right to redhibition. They further argued that the Smiths' waiver was not vitiated by any alleged fraud on their part because the Smiths had all of the knowledge the Granthams possessed regarding the allegedly defective condition of the property at the time of sale, or, the Smiths could have reasonably discovered the truth. In opposition, the Smiths argued that genuine issues of material fact existed as to whether the Granthams misrepresented the condition of the property in the 2016 disclosure, whether the Smiths themselves had knowledge of previous flooding issues, and whether the Smiths waived their rights to redhibition.

As earlier stated, the Smiths also filed a motion for summary judgment, seeking a judgment determining that they were entitled to a rescission of the sale of the property, or a reduction of the purchase price, based on the existence of a redhibitory defect, plus damages and attorney's fees incurred, as a result of the Granthams' failure to disclose the defective condition of the property. In opposition, the Granthams argued the Smiths were not entitled to summary judgment as a matter of law because they knew or should have known of the allegedly defective condition

15

of the property. The Granthams argued they were not in bad faith because the Smiths had all the knowledge that the Granthams had prior to the act of sale.[5]

Mosgrove filed a motion for summary judgment, seeking a judgment dismissing the Smiths' negligent misrepresentation claims against her on the basis that the Smiths had knowledge of the property's previous flooding issues, and therefore, she had no duty to inform the Smiths of previous flooding issues that were known to them. In opposition, the Smiths argued that genuine issues of material fact existed as to whether Mosgrove misrepresented the condition of the property and breached her duty as a real estate agent to communicate accurate information to the Smiths of the property's material defects that were not discoverable by simple inspection. The Smiths contended that Mosgrove gave them and their real estate agent, Peak, "demonstrably false" information regarding flooding issues that were known to Mosgrove, which the Smiths reasonably relied upon.

### Objections to Griffon's Testimony

We first review the Smiths' contention that the trial court erred in sustaining Mosgrove's objections to portions of the deposition of Griffon (offered by the Smiths in opposition to Mosgrove's motion and in support of their own motion) to determine whether the non-considered portions of Griffon's testimony are admissible summary judgment evidence that should be considered in our *de novo* review of the summary judgments. Mosgrove argued that certain portions of Griffon's testimony were inadmissible under the Louisiana Code of Evidence because his testimony lacked foundation and was speculative and incompetent under

---

[5] In their reply memorandum in support of their motion against the Granthams, the Smiths argued that they did not have prior knowledge of any flooding issues; that any purported knowledge they may have had did not absolve the Granthams of their bad faith in failing to accurately and truthfully disclose known flooding issues in the 2016 disclosure; and that Mosgrove's misrepresentations to Peak did not absolve the Granthams of their bad faith.

16

La. C.E. arts. 601, 602, and 701; was not relevant under La. C.E. arts. 801-803; and was inadmissible hearsay under La. C.E. arts. 801-805.

The trial court, and this court on *de novo* review, may only consider evidence that is admissible under the express provisions of La. C.C.P. arts. 966 and 967. **Huggins v. Amtrust Ins. Co. of Kansas, Inc.**, 2020-0516 (La. App. 1 Cir. 12/30/20), 319 So.3d 362, 366. At the time the cross motions for summary judgment were heard and submitted, La. C.C.P. art. 966(A)(4) provided: "[t]he only documents that may be filed in support of or in opposition to the motion are pleadings, memoranda, affidavits, depositions, answers to interrogatories, certified medical records, written stipulations, and admissions." Documents not included in the exclusive list set forth in Article 966(A)(4) were not allowed to be filed unless they were properly authenticated in a deposition or affidavit to which they were attached. See La. C.C.P. art. 966, Revision Comments--2015, Comment (c); **Loupe v. Roman Cath. Church of Diocese of Baton Rouge**, 2022-1153 (La. App. 1 Cir. 4/14/23), 365 So.3d 844, 848, writ denied, 2023-00758 (La. 10/10/23), 371 So.3d 458. In determining if a genuine issue of material fact exists, we cannot determine the credibility of the contents of a deposition, nor can we determine what weight it is to be given. Credibility determinations and the weighing of evidence are not appropriate in summary judgment determinations. **Harris v. Tractor Supply Co.**, 2023-0337 (La. App. 1 Cir. 10/30/23), 377 So.3d 726, 735, writ denied, 2023-01489 (La. 1/17/24), 377 So.3d 245.

Depositions, or excerpts thereof, are among the most common exhibits in summary judgment practice. **Zeno v. Great S. Coaches of Arkansas, Inc.**, 51,370 (La. App. 2 Cir. 5/17/17), 223 So.3d 599, 605. Even so, merely stapling documents to a motion for summary judgment does not "magically" transform them into competent summary judgment evidence. **Randazzo v. St. Bernard Par. Gov't**, 2016-0902 (La. App. 4 Cir. 5/17/17), 219 So.3d 1128, 1132, writ denied, 2017-1209

17

(La. 10/27/17), 228 So.3d 1236. Louisiana Code of Civil Procedure article 1450 governs the use of depositions. The admissibility of any deposition is dependent on whether the deposition would be admissible under the Code of Evidence as if the witness were present and testifying at trial. La. C.C.P. art. 1450(A). See also **Trascher v. Territo**, 2011-2093 (La. 5/8/12), 89 So.3d 357, 363-64. A competent witness is a person of proper understanding. La. C.E. art. 601; La. R.S. 13:3665. A witness may not testify to a matter unless he has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the testimony of the witness himself. La. C.E. art. 602. The testimony of a lay witness is limited to opinions or inferences that are rationally based on his perception and helpful to a clear understanding of his testimony or the determination of a fact in issue. La. C.E. art. 701. Even if contained in a deposition, mere conclusory allegations, improbable inferences, and unsupported speculation are not sufficient to satisfy a party's burden of proof on a motion for summary judgment. **Dragna v. Terrytown Cafe, Inc.**, 2022-239 (La. App. 5 Cir. 10/5/22), 353 So.3d 203, 209. See also **McLin v. Stafford**, 2019-0441 (La. App. 1 Cir. 12/27/19), 292 So.3d 566, 570. Furthermore, hearsay—a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted— is generally not admissible unless it meets one of the exceptions enumerated in the Code of Evidence. See La. C.E. arts. 801(C) and 802, *et seq*.

Griffon was Jarreau's real estate agent in 2015 when Jarreau sold the property to the Granthams. Griffon testified that *he did not recall* ever having a conversation with Mosgrove (the Granthams' real estate agent) regarding whether the home had ever flooded. When asked what he would have responded if Mosgrove had asked him if the property had ever flooded, Griffon testified that *he would have told her* that the property "had taken water." Griffon's responses to this line of questioning are pure speculation regarding a conversation that he did not recall. Further,

18

Griffon's responses to questions regarding prior flooding of the property call for speculation, conclusions, and inferences based on the contents of the 2015 disclosure that was completed by the seller, Jarreau. Griffon *did not recall* assisting Jarreau in filling out the 2015 disclosure. Griffon was not qualified to give opinion testimony regarding the truthfulness of Jarreau's 2015 disclosure or opine on the significance of any inconsistencies with prior disclosures. Any of his responses to such questions are inadmissible hearsay.

Contrary to the Smiths' assertions that the trial court weighed evidence or made a credibility determination, the trial court properly found that Griffon would not be able to provide admissible testimony if the case went to trial and he was subject to cross-examination on the witness stand. See La. C.C.P. art. 1450(A); **Trascher**, 89 So.3d at 363-64. We find no error in the trial court's ruling that sustained Mosgrove's objections to portions of Griffon's deposition.

### Summary Judgment Evidence

On our *de novo* review, we will consider only the admissible summary judgment evidence, consisting of the evidence timely filed and served by the parties in support of their own motions for summary judgment and the evidence timely filed and served by the parties in opposition to the others' respective motions. La. C.C.P. art. 966(D)(2). The evidence filed by the Granthams, Smiths, and Mosgrove, both in support of and in opposition to the respective motions, is virtually identical. For ease of our *de novo* review, we will discuss this evidence generally, noting where the offered evidence differs.

### *The 2006 Disclosure*

Prior property owners Jessica and Brian Antilley prepared a disclosure in 2006 (the "2006 disclosure"). In the 2006 disclosure, in response to Section 1(4), "Has any flooding, water intrusion, accumulation, or drainage problem been experienced with respect to the land?", the Antilleys did not check "Y" or "N," but instead wrote,

19

"See #12." In response to Section 3(12), "Has any structure on the property ever taken water by flooding (rising water or otherwise)?", the Antilleys checked "Y" and indicated that an additional sheet was attached with an explanation. In response to Section 6(28), "Has there been property damage related to the land or the improvements thereon, including, but not limited to ... flood ... or other property damage?", the Antilleys checked "N."

The Antilleys' attached explanation to the Section 3(12) response provided:

> Heavy rains occurred during the night that Hurricane Rita passed through the area. The Mossy Oak Court cul de sac and Old Cypress Circle cul de sac both backed up with water. This resulted in ½" to 1" of water coming into the house. Within 30 minutes of the water entering the house[,] the rain had stopped and the water receded. The only impairment was the saturation of the existing carpet and padding underneath[,] which were immediately removed. New carpet was installed within a week and baseboards were removed to inspect for saturation of the insulation of which there was no evidence.

> It was later discovered that 2 contributing factors caused the backup of water. First, other neighbors told us that a piece of carpet had been dumped into the drainage ditch and was obstructing the outflow of water. Second[,] was that the Parish had restructured the drainage department and had fallen behind on maintenance of the drainage ditches and culverts. A call was placed to the Parish[,] and we were informed that the culverts and drainage ditch were scheduled for cleaning prior to Hurricane Rita[,] but that they had failed to meet their schedule. We were assured that Parish officials were dealing with this situation[,] and it would be rectified.

### *The 2009 Disclosure*

Prior property owners Anita and John Malone prepared a disclosure in 2009 (the "2009 disclosure"). In the 2009 disclosure, in response to Section 1(4), "Has any flooding, water intrusion, accumulation, or drainage problem been experienced with respect to the land?", the Malones checked "Y" and wrote "See attached" for

an additional explanation.[6] In response to Section 3(12), "Has any structure on the property ever taken water by flooding (rising water or otherwise)?", the Malones checked "Y." In response to Section 6(28), "Has there been property damage related to the land or the improvements thereon, including, but not limited to … flood … or other property damage?", the Malones checked "N."

### *Doherty "Mike" Jarreau, the 2015 seller*

The parties filed the deposition of Jarreau and an attached exhibit, the 2015 disclosure prepared by Jarreau in anticipation of the Granthams' purchase of the property. Jarreau, who did not have a contractor's license or a real estate license, testified that he worked in the retail floor business, bought and sold property, and flipped houses for approximately ten to fifteen years. When Jarreau bought the property in 2015, he noted the home had been vacant for several months prior to his purchase. Jarreau testified the house "wasn't bad at all" and was only missing baseboards on the bottom floor when he first purchased it. When asked whether the home had experienced any flood damage, Jarreau testified, "You know, I was told it [had], but, I mean, there was no water there." Jarreau recalled that his real estate agent, Griffon, told him that the "house took water because a contractor had thrown building supplies and carpet in the ditch and stopped the ditch up. Then[,] the backwater out of the ditch supposedly is … [the] water that got in the house." Jarreau testified that whatever damage had been done by that flooding event had been repaired. He stated that "whatever water was there must have been very minimal" and since the sheetrock had not been replaced, there could not have been more than "an inch of water." Jarreau described the improvements that he and his crew made to the property, including the installation of wood floors in the first-floor bedrooms

---

[6] There is no attached explanation for the Malones' response to Section 1(4) on the 2009 disclosure contained in the record on appeal. During Griffon's deposition, counsel for the Smiths indicated there was no attachment to the 2009 disclosure "as far as [he had] seen[.]" Mr. Smith also testified that he did not receive the attachment and could not recall ever identifying or finding an attachment to the 2009 disclosure.

to match the living room floor. Jarreau recalled that his construction crew did not change any sheetrock or cabinets.

In his 2015 disclosure, in response to Section 1(5), "Has any flooding, water intrusion, accumulation, or drainage problem been experienced with respect to the land?", Jarreau checked "Y." Jarreau included a handwritten statement describing the earlier event: "City Master Ditch stopped up with Carpets[.] Trash man-made. House is not [in] Flood Zone." In response to Section 3(12), "Has any structure on the property ever taken water by flooding (rising water or otherwise)?", Jarreau checked "Y." In response to Section 6(31), "Has there been property damage related to the land or the improvements thereon, including, but not limited to … flood … or other property damage?", Jarreau checked "Y." Jarreau testified that his handwritten explanation of the flooding event in response to Section 1(5) was his explanation of what he had been told about the property flooding.

Jarreau denied telling anyone that the property and house had not flooded. Jarreau could not recall who told him that the house had taken on water after the drainage ditch had clogged, but he testified, "I think Mr. Griffon was the one that brought it to my attention when I first bid on it, about the flood." Jarreau stated that during the time he owned the property, the home "had no water in it." Jarreau did not recall speaking to the Granthams nor to Mosgrove about any flooding or drainage issues on the property.

### Duane Griffon, Jarreau's real estate agent

The Smiths filed the deposition of Griffon, to which several exhibits were attached, including the prior 2006 disclosure and 2009 disclosure.[7] Griffon was Jarreau's real estate agent in 2015 when Jarreau sold the "flipped" property to the Granthams. Griffon testified that he did not participate in any of the repairs Jarreau

---

[7] Mosgrove also submitted the deposition of Griffon in opposition to the Smiths' motion. As set forth *supra*, we will only discuss admissible portions of Griffon's testimony.

made to the house. Griffon did not recall assisting Jarreau in filling out the 2015 disclosure. After reviewing the prior 2006 and 2009 disclosures during his deposition, Griffon testified that he did not recall if he had "pulled" those disclosures from the realtors' Multiple Listing Service Listings website ("MLS"), nor could he recall if he had seen the prior disclosures at the time Jarreau filled out his 2015 disclosure. Griffon likewise did not remember if Jarreau had seen any prior disclosures.

Griffon testified that he did not know or remember how Jarreau found out anything regarding the property's flooding history. Griffon indicated, "it was something -- there was a judge, and there was some kind of courts. I remember that, but I don't remember how we got the knowledge of the property flooding." Griffon testified that, to his knowledge, Jarreau never told him any specifics about what structures on the property had previously flooded nor the extent of any flooding.

Griffon did not recall having a conversation or any discussions with Mosgrove about whether the property had ever flooded. He testified, "I have no clue," and stated, "most realtors do talk back and forth, but, no, I don't remember anything specific that I spoke to her [about]." Griffon likewise did not recall ever communicating with the Granthams about whether the property had flooded. Griffon confirmed that it was his normal practice to communicate with the realtor, Mosgrove, as opposed to her clients.

### *Bradley Grantham, 2015 buyer and 2016 seller*

The parties filed the deposition of Mr. Grantham, to which several exhibits were attached, including the 2016 disclosure prepared by the Granthams.

The Granthams purchased the property in June 2015 from Jarreau, who had "flipped" the house (which was in foreclosure) after performing upgrades. Mr. Grantham testified that he received the prior disclosures before purchasing the property, but stated that the affirmative responses to the questions regarding flooding

23

did not raise "a level of concern" with him at that time. Mr. Grantham recalled that Jarreau's disclosure contained a handwritten note about a "carpet in a city[-]maintained ditch somewhere … but that was I think the only thing that raised anything about potential flooding in the property area[.]" Mr. Grantham stated "Jarreau's disclosure [did] not specifically say … that it had taken water on, [and] if so, where on the structure." Mr. Grantham indicated that Jarreau's 2015 disclosures did not raise any concerns at that time because of the explanation provided for answering "yes" in response to Section 1(5) and because Jarreau reiterated that the property was not located in a flood zone.

At some point after the general inspection but prior to the 2015 closing, Mr. Grantham recalled, "the question was asked, had this property flooded." Mr. Grantham testified, "it was relayed to us that it had not." Mr. Grantham testified he believed that it was Griffon (Jarreau's real estate agent) and Mosgrove (relaying information to him from Griffon) who told him there had been no flooding on the property nor inside the home. Mr. Grantham testified that he was satisfied that the property had no flooding issues. He stated "[t]here was … no flooding that we were aware of." Mr. Grantham further testified that he and his wife "would not have bought that house had we known there were any flooding issues on the property, in the house, in the structure[.] [I]f there [was] anything that [was] raised to us, that would cause concern, we would have not bought this house[,] or we would have done tests on the house for mold and other things[.]" The property was not located in a flood zone, so the Granthams did not do any further inspections or tests on the home beyond a general inspection before purchasing the property in 2015.

Mr. Grantham identified the 2016 disclosure and stated that he completed the document in anticipation of the sale of the property "based on our experience as well as what … happened while we lived on the property and in the structure." Mr. Grantham testified that while he and his family lived in the home, they did not have

any issues with flooding on the land nor in any of any structures. In the 2016 disclosure, in response to Section 1(5), "Has any flooding, water intrusion, accumulation, or drainage problem been experienced with respect to the land?", the Granthams checked "N." In response to Section 3(12), "Has any structure on the property ever taken water by flooding (rising water or otherwise)?", the Granthams checked "N." In response to Section 6(31), "Has there been property damage related to the land or the improvements thereon, including, but not limited to … flood … or other property damage?", the Granthams initially gave no response, but later amended their 2016 disclosure and checked "N" to Section 6(31). Mr. Grantham testified that he did not review any prior disclosures before completing the 2016 disclosure.

After the Granthams sold the property to the Smiths, the Grantham family relocated to North Carolina. When Mr. Grantham received the demand letter from the Smiths' attorneys prior to the institution of this lawsuit, he and Mosgrove exchanged text messages. He testified regarding this text message exchange:

> MOSGROVE: Did the seller ever disclose to us that it flooded? Not in flood zone. I don't think you would have bought it had you known it flooded.
>
> MR. GRANTHAM: I don't think so[.]
>
> MOSGROVE: Did not flood in 2016 either[.] I remember it was a foreclosure?? And that's how [Jarreau] purchased it?
>
> MOSGROVE: Not on my computer and having difficulty pulling up old emails, but do we have an email I sent to you or forwarded from [Griffon] about the work [Jarreau] did on the home? I know we have that somewhere. It was all cosmetic. Cutting out Sheetrock and replacing stuff would have been a red flag. I will call you back[.]

### *Angelique Grantham, 2015 buyer and 2016 seller*

The parties filed the deposition of Angelique Grantham. Mrs. Grantham affirmed that when she initialed and signed the 2016 disclosure, the information

therein was true to the best of her knowledge. Mrs. Grantham confirmed that she understood it was her obligation to disclose any known defects in the property that she was aware of.

### *Veronica Mosgrove, the Granthams' real estate agent in 2015 and 2016*

The parties filed the deposition of the Granthams' real estate agent, Mosgrove, and the exhibits attached thereto. Mosgrove obtained her real estate license in 2009 and is a real estate agent with Latter & Blum Realtors.

Mosgrove testified that the 2015 seller, Jarreau, was an "investor" who did not live in the home. After inquiring into what improvements were made when Jarreau "flipped" the house, Mosgrove stated they all seemed "very normal," including new paint, updated flooring, and new front doors. Mosgrove testified that "there was never any indication, anything that would throw up a red flag[,] that they were cutting out [s]heetrock or they were replacing cabinets in the kitchen or anything like that." Mosgrove recalled that the kitchen cabinets were the original cabinets. Mosgrove attended the inspection performed in 2015, prior to the Granthams' purchase. She recalled that the inspector said the home was well-built.

Mosgrove testified that, after she reviewed Jarreau's 2015 disclosure, she "had questions about the ditch," referring to Jarreau's handwritten note after Section 1(5). The Granthams also wanted clarification, so she spoke with Griffon, Jarreau's real estate agent, on the phone to clarify Jarreau's 2015 disclosure responses. She testified that Griffon told her a "ditch had been stopped up[,] but the City Parish had resolved the issue, and there were no issues." Mosgrove asked Griffon if the home had ever flooded. She testified that Griffon "said the home [had] never flooded. According to Mosgrove, Griffon "made it very clear that the home has never flooded." Mosgrove also stated that she had no knowledge that the garage had ever flooded. Mosgrove confirmed on the LSU Ag Center website that the property was not located in a flood zone.

In following up to Jarreau's affirmative response to Section 3(12), "Has any structure on the property ever taken water by flooding (rising water or otherwise)?", Mosgrove testified that Griffon "referred back to the ditch" and said "[t]he issue had been resolved by the City Parish." Mosgrove could not recall if Griffon said whether the land had ever flooded. Mosgrove testified that "to what extent, if there was flooding, that was never made clear." Mosgrove communicated Griffon's responses to Mr. Grantham, recalling "it was important for him to know if that home had flooded." Mosgrove testified that once she and the Granthams were "satisfied with the response we were given[,] and we got through the inspection, it was never discussed again."

In 2016, the Granthams contacted Mosgrove about being their real estate agent again to sell the property because Mr. Grantham had gotten a new job and his family was relocating to North Carolina. Mr. Grantham completed the 2016 disclosure in preparation of the sale. Mosgrove testified that she did not compare the 2016 disclosure to Jarreau's responses in the 2015 disclosure because "a property disclosure is something that the seller fills out to the best of their knowledge." During the inspection, Mosgrove was made aware by Peak, the Smiths' real estate agent, that Peak had pulled the 2015 disclosure from the MLS and noticed a discrepancy between the 2015 disclosure and the 2016 disclosure. Until Peak brought up the discrepancy, Mosgrove had not remembered the information regarding the clogged ditch that was disclosed by Jarreau in 2015.

Mosgrove testified regarding text messages exchanged between her and Mr. Grantham and between her and Peak regarding the Smiths' inquiries into the discrepancy between the 2015 and 2016 disclosures.

> PEAK: [Section 6]31 was skipped on [the 2016 disclosure] regarding damage to house … Do you know why[?]

27

PEAK: They answered b but not 31's question and section a[.]

MOSGROVE: [O]versight. I'm sure. But I will send them your text. There hasn't been any damage.

PEAK: That's what I thought … Can we get them to redo that page please? [Ellipses in original.]

Mosgrove forwarded Peak's question to Mr. Grantham, then they engaged in the following text exchange:

MOSGROVE: I told them it was an oversight. Correct?

MR. GRANTHAM: Correct[.] There is no damage we know of[.]

\*\*\*

MR. GRANTHAM: There have been no issues with 31.

MR. GRANTHAM: If I need to sign another one[,] let me know.

Mosgrove then conveyed Mr. Grantham's response to Peak:

MOSGROVE: Okay. Seller just texted me that was an oversight. No damage that he is aware of in the year he's been there[.]

PEAK: Thank you!

PEAK: Can you get him to check that section please?

MOSGROVE: Of course! He just asked if I needed him to do that. Do you want him to check the one already signed and date it or the original blank one?

PEAK: Whatever's easier :)

PEAK: [The 2015 disclosure] when [the Granthams] bought it says damage. Does he know what happened?

MOSGROVE: No. [The Granthams] bought it from an investor. [T]he investor bought it as a foreclosure. Anyway, investor replaced doors, windows, garage door, etc. It was all redone when [the Granthams] bought. In fact, inspector commented on the quality of the home. Even the appraiser was super complimentary and the house appraised very high.

MOSGROVE: Seller is going to check [Section 6]31, initial and date. I told him I can't do [it] via docusign because by law, I can't touch [the 2016 disclosure. ] …

PEAK: [W]ill you ask your client what happened with flooding? When he bought it, the [2015 disclosure] says it flooded, can't read the handwriting saying what happened … I know he bought it from investor, but [2015 disclosure] was filled out with answers so [I'm] sure he asked[.] [Ellipsis in original.]

MOSGROVE: I'll ask.

Mosgrove forwarded Peak's question to Mr. Grantham as asked, "Do you recall this???", which prompted the following text exchange:

MR. GRANTHAM: It has never flooded since we were in there. A few years ago a drainage ditch needed to be unclogged behind the houses at the end of the street.

MR. GRANTHAM: Normal collection of water during heavy rains, no big deal. Let me know if this is an issue, it shouldn't be[.]

***

MOSGROVE: Ok[.]

MR. GRANTHAM: You know how … I am, would have never bought the house if there was any serious issues or ANY flooding issues or past flooding issues.

MOSGROVE: I know[.]

Mosgrove responded to Peak:

MOSGROVE: The sellers have never had an issue – including during the time a few months back when we had all of that flooding and bad weather--but this is what the seller was told by the person he bought it from:

A few years ago a drainage ditch needed to be unclogged behind the houses at the end of the street.

PEAK: So no flooding inside house even before he lived there?

MOSGROVE: No idea and don't know if he was told anything. Checking. He did tell me – "you know how … I am, I never would have bought a home that had or I thought had flooding issues."

Mosgrove texted Mr. Grantham and asked whether there had been any flooding inside the home:

MOSGROVE: ... Do you remember whether your seller said there was actually flooding inside the house? Did he know that?

MR. GRANTHAM: I asked and there had not been any. And he knew the answer to that.

MOSGROVE: Great[.]

Mosgrove texted Mr. Grantham's response back to Peak:

MOSGROVE: From seller – I asked and there had not been any. And he knew that answer.

PEAK: Thanks!

MOSGROVE: You are so welcome!

Mosgrove testified that she did not advise Mr. Grantham to revise his answers on the 2016 disclosure because the information regarding any flooding or drainage issues or flooding damages were addressed in the text message exchanges. Mosgrove stated that she did not have any issues with the discrepancy in the 2015 and 2016 disclosures once she disclosed the information to Peak via text messages. Mosgrove testified that it was up to Peak to convey that information to the Smiths so they could decide whether to conduct any more inspections before proceeding with the sale.

Mosgrove testified that she was shocked and concerned when she received a demand letter from the Smiths' attorneys prior to the institution of this lawsuit because the property was not located in a flood zone, and she had no knowledge of the Granthams having had any flooding or drainage issues with the property. In response to whether she had any independent knowledge whether the property had ever flooded, Mosgrove stated, "I still don't know if the house flooded."

### Meghan Peak, the Smiths' real estate agent

The parties filed the deposition of Peak, the Smiths' real estate agent in this transaction, who is also the daughter of Mrs. Smith and the step-daughter of Mr. Smith. Peak obtained her real estate license in 2015, and was a real estate agent with

Keller Williams at the time of this sale. Peak's real estate license is currently inactive, and she is now a nurse.

Peak was aware before the Smiths purchased the property that the Granthams had only lived in the home for about a year, and they had purchased the property from a seller who had bought it as an investment property. When Peak reviewed the 2016 disclosure completed by the Granthams and noticed that some questions were not answered, she testified that it "threw up a red flag," so she pulled the 2015 disclosure from the MLS. Peak observed the discrepancy between the 2015 and 2016 disclosures. She affirmed that she understood Jarreau's responses on the 2015 disclosure to mean that the house had possibly flooded.

Peak then contacted Mosgrove to find out if the home had flooded. She stated that she did not attempt to contact Jarreau or Griffon to clarify the 2015 disclosure. Peak asked Mosgrove to clarify Jarreau's handwritten explanation on the 2015 disclosure in response to Section 1(5) "because it was illegible." She testified that at some point during the text message exchange (after Mosgrove clarified that a drainage ditch had been clogged), she also had a phone conversation with Mosgrove. Peak stated that Mosgrove told her "water was only backed up to the garage, it never entered the home." Peak confirmed that based on her phone conversation with Mosgrove, she thought that the driveway/garage area was the only area where flooding had occurred on the property; no flooding inside the home. Peak testified that she understood that the structure discussed by Jarreau in the 2015 disclosure meant that water "went into the garage area but not into the house."

Peak testified that she showed Mrs. Smith the 2015 disclosure but could not recall if she gave her a physical copy of it or emailed it to her. Peak indicated she and Mrs. Smith discussed parts of the 2015 disclosure, including whether Mrs. Smith could read Jarreau's handwritten explanation of the flooding event. Peak also discussed the information she had received from Mosgrove with Mrs. Smith. Peak

did not recall speaking to Mr. Smith about the 2015 disclosure and the information she had received from Mosgrove.

Peak testified that she was satisfied with Mosgrove's explanation and that no further "due diligence" was performed to determine if the property had previously flooded. Peak stated she never spoke to the Granthams about the 2016 disclosure.

Peak testified that even though she had access to the 2006 and 2009 disclosures prior to the sale at issue in 2016, she did not pull those prior disclosures from the MLS in anticipation of the Smiths' purchase because real estate agents "aren't required legally to go behind and ... look at every single document for a house listing." She testified that as an "unexperienced agent," she "trusted one that had been well known. I trusted everyone's word, and that's why we didn't continue to search for anything. I didn't even think to go look at the other property disclosures because it was clarified that there was nothing to worry about." Peak indicated that she did not go back to the MLS to pull the 2006 and 2009 disclosures until after the property flooded in 2019, when the Smiths discovered holes drilled in the sheetrock when they removed the baseboards. Peak testified that her ex-husband previously had a mold remediation business and helped the Smiths with the removal of the sheetrock after the 2019 flood event.

### *Susan Smith, 2016 buyer*

The parties filed the deposition and affidavit of Mrs. Smith. At the time the Smiths began looking for homes to purchase in the Baton Rouge area, Mr. Smith was working in a different city, so Mrs. Smith was primarily responsible for finding the couple a home in the Baton Rouge area. Mrs. Smith testified that Peak had possession of and showed her the 2015 disclosure prior to the sale. Mrs. Smith stated that she was aware of the discrepancies between Jarreau's 2015 disclosure and the Granthams' 2016 disclosure prior to purchasing the property. Her understanding was that Peak communicated with Mosgrove, who assured Peak that the home had

not flooded. Mrs. Smith asked her daughter if she trusted Mosgrove. Peak indicated that she trusted what Mosgrove had told her.

Mrs. Smith testified that other than the 2015 disclosure, which checked "Y" to the questions regarding flooding and flood damages on the property, she did not believe the Granthams had any other information they failed to disclose to the Smiths. Ms. Smith did not recall telling her husband, Mr. Smith, that Peak discovered a prior disclosure that indicated the property had previously flooded because she thought the issue had been resolved.

### *Michael Smith, 2016 buyer*

The parties filed the deposition and affidavit of Mr. Smith. Prior to purchasing this property, Mr. Smith denied having any conversations with anyone about whether this property had previously flooded. Mr. Smith testified that the inspection of the property did not reveal any mold or flooding issues. The Smiths did not have a mold or fungi inspection performed on the property prior to their purchase. Mr. Smith denied having any information that any flooding occurred in the house while the Granthams lived there, nor did he have any evidence that the Granthams had any information about flooding issues on the property, other than what Jarreau wrote on the 2015 disclosure.

Mr. Smith confirmed that the property is prone to flooding after heavy rain events because water is not able to drain quickly enough from a storm drain that is located on the property line; therefore, water backs up onto the property. Mr. Smith stated the property has flooded twice since his purchase—once on June 6, 2019, during a "microburst" rainfall event resulted in eight to nine inches of water in the house, and a second time in May 2021, when heavy rainfall resulted in ten to eleven inches of water in the house. Mr. Smith also testified that his neighbors told him the property had flooded at least three other times prior to the Smiths' purchase in August 2016—first in 2008, a second time in 2012, and a third time in 2014. After

the 2019 flood event, the Smiths obtained flood insurance for the property. After the 2021 flood event, the Smiths received $84,000.00 in proceeds from a claim payout. Mr. Smith testified that FEMA denied part of his 2021 flood claim because the denied items were listed as a claim payout after a 2014 flood event.

Mr. Smith's former son-in-law, Joel Peak (Peak's ex-husband), had a mold remediation business, Peak Investments, LLC. Mr. Peak helped Mr. Smith with demolition and repair work, beginning the day of the 2019 flood event. Mr. Smith stated that he and Mr. Peak removed cabinets, a bookshelf, and "built-ins" in order to access the sheetrock and insulation. He testified they removed the lower two to four feet of sheetrock. It was then that he and Mr. Peak identified the presence of mold. Mr. Smith stated, however, that Mr. Peak was not a licensed mold expert. Mr. Smith also confirmed that neither he nor his wife were mold experts. Mr. Smith indicated that he did not have a mold inspection performed on the property by a licensed mold inspector until after the May 2021 flood event. At that point, no mold was detected, which Mr. Smith explained was because they "had done the remediation [in 2019], so there was no mold." Mr. Smith stated he did not have any information to suggest that Mosgrove knew the house had any mold before the Smiths' purchase.

Mr. Smith testified that, during the 2019 remediation work, he also discovered one-inch diameter holes cut into the sheetrock that had been covered up by baseboards and cabinetry. Mr. Smith stated that Mr. Peak told him those holes were cut to "allow water to drain" based on what Mr. Peak had seen in other houses and remediation cases. Mr. Smith testified that he thought the holes had been cut by Jarreau based on his observation of the name "Mike Jarreau" written in sharpie behind one of the baseboards. Mr. Smith did not have any knowledge of whether the Granthams had cut any of the holes in the sheetrock.

Mr. Smith testified that Peak did not inform him of the 2015 disclosure or its contents prior to the August 2016 sale. Mr. Smith stated he had no knowledge of the discrepancy between the 2015 disclosure and the 2016 disclosure prior to his purchase of the property. Mr. Smith testified: "I did not have any direct communication about that disclosure. I didn't know that it existed or that she had it." Mr. Smith did not recall any conversations about the 2015 disclosure, noting that he was out of town at the time. Mr. Smith indicated that he had since been made aware that Peak did not access all past disclosures on the property from the MLS prior to his purchase. Mr. Smith did agree, however, that because Peak had a copy of the 2015 disclosure, she had knowledge that the property had flooded at the time the Granthams executed the 2016 disclosure.

Mr. Smith testified he would not have purchased the property if he had known it had flooded. He also stated he "would like that it would not have to be me that would have to repair it," indicating that "whoever owns the house after we have a resolution to this lawsuit" would make the repairs. Mr. Smith confirmed that he was intentionally causing himself and his wife to live in an unfinished house. After being asked why Mr. Smith had not sued Peak, he stated "[s]he's my stepdaughter." He testified that Peak "didn't do anything wrong" because she asked Mosgrove about the 2015 disclosure and was given an affirmative answer that the house had never flooded. From there, it was conveyed to him that the house had never flooded, and he was given the 2016 disclosure where the Granthams disclosed that the house had never flooded.

In their identical affidavits, the Smiths swore they relied on Mosgrove's and the Granthams' "definitive representations as to the condition of the [p]roperty regarding flooding," when they purchased the property. They both attested to the following:

35

6. I have experienced water accumulation and drainage problems (collectively, the "**issues**") since purchasing the [p]roperty from [the Granthams]. These issues are the result of hidden non-apparent, latent defects not discoverable by a simple inspection.

7. The drainage and water accumulation issues have persisted and have caused significant problems, including flooding of the [p]roperty on June 6, 2019, and numerous times thereafter.

8. Upon commencement of repairs and remedial measures necessitated by such flooding, I discovered mold throughout the [p]roperty behind the baseboards and cabinetry.

9. While engaged in repairs and mold remediation measures caused by flooding, I also discovered holes in the sheet rock that were covered up by baseboards and cabinetry. These types of holes are consistent with the holes that would generally be made in an effort to remediate previous flood damage.

10. The previous flood damages were unknown to me at the time of the [p]roperty's purchase.

11. I was not aware of the [p]roperty's propensity for flooding.

12. The defective condition with the [p]roperty remains unresolved.

13. At the present time, the [p]roperty is in a state of disrepair.

14. To date, I have incurred costs in remediating and repairing the flood damage and mold.

15. Had I known of the defective condition of the [p]roperty, I would not have purchased the [p]roperty from [the Granthams].

### Analysis after *De Novo* Review

#### *Redhibition Claim against the Granthams*

After our *de novo* review of the summary judgment evidence, we conclude that the trial court correctly granted summary judgment in favor of the Granthams against the Smiths. As stated earlier, under La. C.C. art. 2521, a seller owes no warranty for defects that were known to the buyer at the time of the sale or for defects

that a reasonably prudent buyer should have discovered. Further, under the RPDA, a property disclosure document shall not constitute a warranty by the seller and information contained therein is for disclosure purposes only. La. R.S. 9:3198(D)(1). A property disclosure document may not be used as a substitute for any inspections or warranties that the seller or buyer may obtain, and the RPDA does not preclude the buyer's rights or duties to inspect the physical condition of the property. La. R.S. 9:3198(D)(2).

In the 2016 disclosure, the Granthams did not disclose any flooding issues with the property or any damages to the property caused by flooding. Specifically, the Granthams denied experiencing any flooding, water intrusion, accumulation, or drainage problem with respect to the land (Section 1(5)); denied that any structure on the property had ever taken water by flooding (rising water or otherwise) (Section 3(12)); and initially left their response to Section 6(31) blank, but amended the 2016 disclosure and denied the existence of flood or other property damage related to the land or the improvements thereon.

After receiving the 2016 disclosure and observing the blank response to Section 6(31), the Smiths' real estate agent, Peak, pulled the prior 2015 disclosure. As discussed herein, the 2015 disclosure answered "Y" to all three questions—Section 1(5), Section 3(12), and Section 6(31)—regarding flooding and property damage related to flooding. The 2015 disclosure also included a handwritten note in response to Section 1(5), explaining an incident involving flooding, water

37

intrusion, accumulation, or a drainage problem with respect to the land. Peak then alerted the Smiths to the discrepancy between the 2015 and 2016 disclosures.[8]

At that point, the Smiths were put on notice of the property's past flooding issues and flooding damages. As a result, the Smiths should have conducted further inspections; however, the Smiths chose not to do so. The Smiths cannot now use their alleged reliance on explanations of prior property disclosures or discussions between the buyers' and sellers' real estate agents as an excuse for failing to obtain a comprehensive home inspection and/or mold inspection once they became aware the property had previously flooded and experienced flood damages. See **McDonald**, 385 So.3d at 1168.

The Granthams owed no warranty for defects that the Smiths, as reasonably prudent buyers, should have discovered. Based on their knowledge of the property's propensity for flooding, discovered through the disclosures made on the prior 2015 disclosure, we find there are no genuine issues of material fact that the Smiths knew or should have known the property's propensity for flooding warranted further inquiry and that a reasonably prudent buyer would have discovered the defects of which they now complain. Accordingly, the Granthams did not fraudulently fail to disclose known defects, and under La. C.C. art. 2548 and La. R.S. 9:3198, the Smiths' waiver of redhibitory defects was valid.

---

[8] The summary judgment evidence establishes that the Smiths purchased the property jointly as husband and wife. In her deposition, Mrs. Smith explained that Mr. Smith was working out of town at the time and that she primarily dealt with finding a home for the couple to purchase. Mrs. Smith did not recall telling her husband about Peak discovering the discrepancy between the 2015 and 2016 disclosures, and in his deposition, Mr. Smith denied that she did. However, there is no dispute that Mrs. Smith handled some aspects of the home purchase on behalf of the couple, with Mr. Smith's knowledge and consent. Furthermore, Mrs. Smith admitted that she had knowledge of the prior flooding issues based on the 2016 disclosure. Under these circumstances, Mr. Smith cannot deny knowledge of the 2015 disclosure and the prior flooding issues for purposes of the claims that he and his wife have jointly asserted herein. See **Pittman v. Pomroy**, 552 So.2d 983, 989-90 (La. App. 2 Cir. 1989).

## _Negligent Misrepresentation Claim against Mosgrove_

As a real estate agent, Mosgrove had a duty to supply correct information. **Riedel**, 270 So.3d at 591. As discussed above, real estate agents do not have a higher duty than the sellers to supply accurate information; that would create a situation in which the agent had to independently verify information before conveying it to the buyer. **Chmielewski**, 374 So.3d at 418. Mosgrove had a duty to disclose known material defects regarding the condition of real estate of which she, as the real estate agent, was aware. La. R.S. 37:1455(A)(27); **Riedel**, 270 So.3d at 592. Louisiana Revised Statutes 9:3894(B) relieves a real estate agent of liability for providing false information if she did not have actual knowledge that the information was incorrect. **Chmielewski**, 374 So.3d at 418.

Here, Mosgrove testified (and produced text messages to the same effect) that during her discussions with Griffon (the seller's real estate agent) in 2015 before the Granthams purchased the property, she asked Griffon if the home had ever flooded, and Griffon made it very clear when he told her the home had never flooded. Mosgrove stated that Griffon's explanation for Jarreau's "Y" responses to the three questions—Section 1(5), Section 3(12), and Section 6(31)—regarding flooding and property damage related to flooding on the 2015 disclosure were given by Jarreau based on flooding caused by a nearby drainage ditch that had stopped up, but had since been resolved by the City-Parish. In opposition to Mosgrove's motion, the Smiths did not file any evidence that contradicted her testimony and evidence. By filling out and providing the 2016 disclosure to the Smiths, which denied any flooding issues or flooding damages—it was the Granthams, as the sellers, who supplied inaccurate information—not Mosgrove. There is no genuine issue of material fact that Mosgrove did not have actual knowledge of the property's flooding issues and damages. For these reasons, we find that the trial court correctly granted Mosgrove's motion for summary judgment against the Smiths.

**CONCLUSION**

For the foregoing reasons, the May 2, 2023 judgment of the trial court is affirmed. Costs of this appeal are assessed to Michael and Susan Smith.

**AFFIRMED.**

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

* * * * * * *

**2023 CA 0881**

MICHAEL SMITH AND SUSAN SMITH

VERSUS

BRADLEY AND ANGELIQUE GRANTHAM, AND VERONICA MOSGROVE

**WELCH, J., *dissenting in part.***

I agree with the majority that the trial court correctly granted summary judgment in favor of Mosgrove, in favor of the Granthams, and against Mrs. Smith. I must dissent, however, as to the majority's ruling that the trial court correctly granted summary judgment against Mr. Smith.

My *de novo* review of the record reveals that the trial court erred in granting summary judgment against Mr. Smith. There are genuine issues of material fact as to whether Mr. Smith had knowledge of the property's flooding issues, such that the knowledge would vitiate his consent to the sale. The evidence is crystal clear that the defendants, Bradley and Angelique Grantham, failed to disclose in the 2016 disclosure from that the property had previously flooded. The 2016 disclosure was inaccurate, if not fraudulent, because the prior flooding issues were not disclosed by the Granthams.

Peak, the real estate agent for the Smiths, discovered a discrepancy between the 2015 and 2016 disclosures, which put her on notice of the property's prior flooding issues. Peak and Mrs. Smith both testified that Peak shared the information regarding the property's flooding issues with Mrs. Smith prior to the sale. Peak, Mrs. Smith, and Mr. Smith all testified that Peak **did not** share that information regarding the property's flooding issues with Mr. Smith prior to the sale. There was no evidence submitted in support of or in opposition to the parties' motions for

summary judgment, nor is there any legal basis, to impute Mrs. Smith's knowledge of the flooding defect to Mr. Smith.

Furthermore, the trial court erred to the extent it reasoned that Peak's notice of the alleged defect was imputable to the Mr. Smith through her agency. As posited by the majority, a real estate broker, salesperson, licensee, or real estate agent is not an "agent" of their clients within the purview of the mandate provisions of the Louisiana Civil Code. See **Verdin v. Rogers**, 2003-1457 (La. App. 5 Cir. 4/27/04), 873 So.2d 804, 807, writ denied, 2004-1231 (La. 9/24/04), 882 So.2d 1128; **Smith v. Remodeling Serv., Inc.**, 94-589 (La. App. 5 Cir. 12/14/94), 648 So.2d 995, 999; **Reeves v. Weber**, 509 So.2d 158 (La. App. 1 Cir. 1987); **Leggio v. Realty Mart, Inc.**, 303 So.2d 920, 923-24 (La. App. 1 Cir. 1974), writ denied, 307 So.2d 629 (La. 1975). Thus, knowledge of a defective condition cannot be imputed to a client simply because his real estate agent was aware of the problem. **Frugé v. Hancock**, 94-730 (La. App. 3 Cir. 12/7/94), 647 So.2d 488, 492, writ denied, 95-0070 (La. 3/10/95), 650 So.2d 1181; **Mintz & Mintz Realty Co. v. Sturm**, 419 So.2d 981, 983 (La. App. 4 Cir.), writs denied, 423 So.2d 1163, 1164 (La. 1982). See also Peter S. Title, "Generally," *Louisiana Real Estate Transactions*, LOUISIANA PRACTICE SERIES, 1 La. Prac. Real Est. § 12:1 (2d ed.) (November 2023 Update).

Accordingly, Peak's knowledge of the property's propensity for flooding cannot be imputed to Mr. Smith. See, e.g., **Mintz & Mintz Realty Co.**, 419 So.2d at 983 (Knowledge of a defective sill could not be imputed to the plaintiff simply because its real estate agent was aware of the problem. There was some evidence that the plaintiff had not been informed of the condition of the sill, and the plaintiff was unaware of this defect.).

On that basis, I find genuine issues of material fact exist as to whether the Granthams fraudulently failed to disclose to Mr. Smith known defects in their 2016 disclosure executed prior to the sale, and whether, under La. C.C. art. 2521 and La. R.S. 9:3198(D), Mr. Smith's waiver of redhibitory defects was valid. I would reverse

the portion of the trial court's May 2, 2023 judgment that granted summary judgment in favor of the Granthams and against Mr. Smith and dismissed his redhibition claim against the Granthams.

For these reasons, I respectfully dissent in part.